824 A.2d 107

**RITE AID CORPORATION, et al.,**

v.

**Dexter HAGLEY, et al.**

**No. 65 Sept. Term, 2002.**

Court of Appeals of Maryland.

May 13, 2003.

666

668

Argued before BELL, C.J. ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BELL, Chief Judge.

Md.Code (1974, 2002 Repl.Vol.), § 5–620 of the Courts and Judicial Proceedings Article (CJ) and Md.Code (1984, 1999 Repl. Vol.) § 5–708 of the Family Law Article (FL) grant immunity from civil and criminal liability to any person making a good faith report of child abuse or neglect. The questions to be resolved by this appeal and cross appeal involve the scope of that immunity.

## I.

Dexter Hagley ("Mr.Hagley") and his former wife, Lystra Martin ("Ms.Martin") are the parents of Kerwyn Hagley (collectively, "respondents"). On March 23, 1999, Mr. Hagley took an undeveloped roll of film to the Rite Aid store ("Rite Aid") in the Alameda Shopping Center in Baltimore City for processing, as he had done on "many" previous occasions. Opting to have the film printed by the store's one-hour developing and printing process, he completed the required form and left the film with the store manager, Robert Rosiak ("Mr.Rosiak"), one of the petitioners, who developed the film.

Sixteen photographs were printed from the roll of film. Four of them depicted Mr. Hagley and a young boy, later determined to be his then eight-year old son, in a bathtub. The Court of Special Appeals described these four photographs, in its unreported opinion, as follows:

"Mr. Hagley was wearing shorts; Kerwyn was naked. The first of those photographs show Mr. Hagley sitting in the tub of soapy water, with Kerwyn sitting on his lap. Mr. Hagley's left arm was around the upper part of the boy's body, with his left hand on Kerwyn's right shoulder. Kerwyn's left hand was in his lap, and his father's right hand was on or over the boy's left hand. Both were laughing. The second photograph shows Mr. Hagley sitting in the tub, with his left hand hidden behind Kerwyn's thigh. The boy

was standing with his back to the camera, looking over his shoulder toward the camera. Both were laughing. The third photograph shows Mr. Hagley sitting in the tub, looking up at Kerwyn, who was standing facing the camera. The fourth photograph shows Mr. Hagley and Kerwyn sitting in the tub, at the tap end, looking toward the camera."

Mr. Rosiak was troubled by the photographs of Mr. Hagley and the child because, in at least one of the photographs, Mr. Hagley's hand appeared to be "cupping" the child's genitals.[1] Finding them ambiguous, he was not certain how to interpret them.

When Mr. Hagley returned to the store to pick up the processed film (i.e. photographs and negatives), Mr. Rosiak refused to give him the photographs. Mr. Hagley asked why, and Mr. Rosiak answered: "I'm seeing some things in those pictures, and I don't think I can give them to you." Despite Mr. Hagley's request that he do so, Mr. Rosiak refused to show Mr. Hagley the photographs or explain their objectionable content. When pressed further for an explanation, he stated "I'm seeing signs of child pornography, pedophile [sic] and improper touching of a minor." That comment, Mr. Hagley alleges, was made loudly and in the presence of other Rite Aid customers. Mr. Hagley advised Mr. Rosiak that the child depicted in the photographs was his eight-year old son, Kerwyn, and that the photographs were taken by the child's mother, Ms. Martin. Mr. Hagley subsequently brought Ms. Martin to the store to verify that statement.

---

1. For clarification we note that the Court of Special Appeals, in its unreported opinion, indicated that Mr. Rosiak testified that two of the photographs, in his opinion, appeared to show Mr. Hagley "cupping the child's genitals." The petitioners state in their brief, however, citing to Mr. Rosiak's affidavit, that "in one of the pictures" Mr. Rosiak believed that Mr. Hagley's hand was cupping the child's genitals. Our review of Mr. Rosiak's deposition testimony discloses that Mr. Rosiak testified that the "pictures . . . seemingly [showed Mr. Hagley] playing with this child's genitals."

**672**

Apparently unsatisfied with Mr. Hagley's explanation and still unsure of how to resolve the matter, Mr. Rosiak requested that Mr. Hagley return to the store at 1:00 p.m., at which time a supervisor would have an answer. He then consulted Rite Aid headquarters, and was instructed to report the matter to law enforcement and turn the photographs over to them. Mr. Rosiak complied with that instruction by .contacting the Baltimore City Police. Upon returning to the store a few minutes before the appointed hour, Mr. Hagley observed Mr. Rosiak having a conversation with a group of people. As described by the intermediate appellate court (emphasis added),

"When Mr. Hagley returned to the store several minutes before 1:00 p.m., he observed Mr. Rosiak *showing the photographs* to three other people and discussing the pictures with them. Mr. Hagley recognized those three people: one was an employee of Rite Aid, whom he knew only as "Chris" (assistant manager Carrissa Esposito); the second was a mall security guard he knew as Mr. Byrd; and the third was another mall security guard whose name he did not know. Mr. Rosiak was asking their opinion of the photographs, but each of them declined to venture an opinion. When Mr. Rosiak and the others saw Mr. Hagley, who was about twelve feet away, the conversation stopped." [2]

---

**2.** Although the petitioners repeated this recitation of the facts in their Petition for Writ of Certiorari and endorsed it, they now maintain that the Court of Special Appeals misstated the facts. They submit that, in his deposition testimony, Mr. Hagley identified only one of the persons to whom Mr. Rosiak was talking, the security guard, Mr. Byrd and that he stated that he *only* overheard the group discussing the decision to be made about the photographs; Mr. Hagley was unable to say whether he had seen Mr. Rosiak actually show the photograph to Mr. Byrd. Mr. Rosiak, the petitioners point out, denied, in his deposition testimony, that he showed the photographs to Mr. Byrd; however, he acknowledged showing them to Ms. Esposito before calling the police. At oral argument in this Court, the respondents conceded that there was no evidence in the record to support the Court of Special Appeal's assertion that Mr. Rosiak showed the photographs to Mr. Byrd or to any other non-Rite Aid employee. It thus appears that the petitioners' factual recitation is correct.

Shortly after the group that Mr. Rosiak had been talking to dispersed and there had been a brief conversation between Mr. Hagley and Mr. Rosiak, three uniformed Baltimore City Police Officers arrived at the Rite Aid store. They were met by Mr. Rosiak who escorted two of the officers into his office. Mr. Hagley remained in the store with the third officer. After meeting with Mr. Rosiak and examining the photographs, the officers questioned Mr. Hagley briefly. Being, like Mr. Rosiak, uncertain as to whether the photographs depicted child abuse, the officers called a detective with the child abuse unit of the criminal investigation division to examine some "questionable photographs of a young child."

The detective came to the Rite Aid Store. After reviewing the photographs and questioning a few people, he determined that the child in the photographs was Mr. Hagley's son, but that the photographs were "questionable." Believing, therefore, that further inquiry was warranted, he thus took possession of the photographs, later, submitting them to the evidence control unit, and caused Kerwyn to be taken into the custody of Child Protective Services in order to be interviewed at the Baltimore Child Abuse Center. In addition, the detective sought the opinion of the Baltimore City State's Attorney Office as to whether the content of the photographs warranted the filing of criminal charges.

Mr. Hagley was transported to the police station for questioning by one of the police officers. According to the detective, he was never placed under arrest and, in fact, was free to leave at any time. According to Mr. Hagley, although he was told by the police officers that he could leave, subject to later being picked up at home and taken to the police station, the detective told him that he had to come downtown to answer questions at the police station. He indicated further that he was not told he was free to leave the police station until approximately 7:00 p.m., when, after questioning and investigation, the State's Attorney's Office had determined that no criminal charges were warranted. Thereafter, Mr. Hagley,

was driven back to the Alameda Shopping Center to retrieve his car.[3]

## II.

The respondents filed a complaint against Mr. Rosiak and Rite Aid Corporation (collectively "the petitioners"), alleging various causes of action arising out of the events, involving the photographs, occurring on May 23, 1999. Their Second Amended Complaint contained eleven counts: Count I, breach of privacy; Count II, false imprisonment; Count III, malicious prosecution; Count IV–A, Negligence; Count IV–B, Negligence of Defendant Rosiak (with Defendant Rite Aid liable under the rule of respondeat superior); Count IV–C, Breach of contractual duty; Count V, Defamation of Character; Count VI, Unreasonable Invasion Upon Seclusion/Breach of Privacy; Count VII, Breach of Privacy/Unreasonable Publicity Given to Private Life; Count VIII, Breach of Privacy/Publicity Unreasonably Placing Person in a False Light; Count IX, untitled, asserting, as next friend for Kerwyn Hagley, Ms. Martin's claim for the alleged injury sustained by Kerwyn as a result of his detention in a foster home against his will. The petitioners answered the complaint and, subsequently, filed a motion for summary judgment, premised on the statutory immunity prescribed by CJ § 5–620 and FL § 5–708. The Circuit Court for Baltimore City, concluding that the "report of suspected child abuse was made in good faith" and, therefore, that there was no genuine dispute of material fact because the petitioners were immune from "*all* civil liability based on Md.Code Ann., Cts & Jud. Proc. § 5–620 and Md.

---

**3.** Mr. Hagley attempted to pick up his son from Child Protective Services, but was informed that he had to attend a hearing in two days. Because the State had chosen not to pursue criminal charges the entire matter was dropped and no custody hearing was scheduled, or held. Nevertheless, due to an administrative error or failure of communication, Child Protective Services was not informed of the State's Attorney's decision to drop the matter in a timely manner. As a result, Kerwyn was kept at a foster home for two nights before ultimately being reunited with his parents.

Code Ann., Fam. Law § 5–708," (emphasis added), granted summary judgment.

On direct appeal to the Court of Special Appeals, the respondents challenged the propriety of the trial court's grant of summary judgment in favor of the petitioners. They cited as error, the trial court's conclusion that there was no evidence to rebut the petitioners' assertion that Mr. Rosiak acted in good faith. The intermediate appellate court acknowledged that questions of "good faith 'almost always' present an issue of fact for trial; therefore, 'generally summary judgment is inappropriate where motive or intent is at issue since inferences must be resolved against the moving party.'" Nonetheless, the court determined that, because there was no evidence that contradicted Mr. Rosiak's assertion that his report to law enforcement was made in good faith, *certain* of the claims in the case *sub judice* were appropriately resolved on summary judgment. As to that, the court held:

> "because there is no evidentiary basis for any inference that Rosiak did not act in good faith in reporting to the police his conclusions that the photographs depicted child pornography or child abuse or both, and in delivering the photographs to the police, he, and therefore his employer, were entitled to immunity provided by CJ § 5–620. Consequently, the circuit court did not err in granting summary judgment in favor of [appellants] on Counts II (false imprisonment), III (malicious prosecution), IV–A and IV–B (negligence), IV (breach of contractual duty); and IX (the claims of Kerwyn Hagley and his mother), because all of the alleged wrongs and resulting harms and damages asserted in those counts directly resulted from those acts of Rosiak that were protected by the immunity afforded by CJ § 5–620."

The Court of Special Appeals determined, however, that "[t]he remaining counts, I, VI, VII, and VIII, asserting causes of action for various forms of breach or invasion of privacy, and Count V, asserting a cause of action for defamation, are based, in part, on conduct by Mr. Rosiak that is not protected by the immunity conferred by CJ § 5–620 and FL § 5–708."

It explained that the conduct shielded by CJ § 5–620 and FL § 5–708 is the reporting of child abuse or neglect or the participation in an investigation or resulting judicial proceeding. Then, noting that the respondents alleged that Mr. Rosiak slandered Mr. Hagley in the presence of other Rite Aid customers and that he displayed the photographs to persons other than police officers, the intermediate appellate court concluded that neither of these acts was related to Mr. Rosiak's obligation to report suspected child abuse. Consequently, holding that the conduct supporting the allegations of defamation and invasion of privacy exceeded the qualified immunity of the statutes, it vacated the judgment as to those counts and remanded the case to the trial court for further proceedings.

Both parties sought review of the rulings of the Court of Special Appeals, the petitioners filing a petition for writ of certiorari and the respondents, a cross-petition. We granted both petitions. *Rite Aid v. Hagley*, 371 Md. 68, 806 A.2d 679 (2002).[4]

### III.

To address and combat the problem of child abuse and neglect, the Maryland General Assembly, by Acts of 1987, ch. 635, § 2, enacted legislation, *see* Md.Code (1984, 1999 Repl. Vol., 2002 Supp.) §§ 5–701–5–714 of the Family Law Article, *inter alia,* mandating the reporting of suspected child abuse or neglect to the appropriate authorities and "giving immunity to any individual who reports, in good faith, a suspected incident of abuse or neglect." *See,* § 5–702, stating the legislative policy of subtitle 7 of title 5 of the Family Law Article.[5]

---

**4.** Although, we have granted the cross-petition and it is proper to refer to Mr. Hagley, Kerwyn Hagley and Ms. Martin as the cross-petitioners, for the sake of convenience and clarity, we shall refer, throughout the entirety of this opinion, to Mr. Hagley, Kerwyn Hagley and Ms. Martin as the respondents. Likewise, we shall refer, throughout the entirety of this opinion, to Rite Aid and Mr. Rosiak as the petitioners.

**5.** Md.Code (1984, 1999 Repl.Vol., 2002 Supp.) § 5–702 of the Family Law Article provides:

The policy underlying the reporting requirement imposed, and the immunity given, "is to protect children who have been the subject of abuse or neglect." *See Bentley v. Carroll,* 355 Md. 312, 324, 734 A.2d 697, 704 (1999) (stating that the purpose of the reporting requirements is "to redress previous abuse and to prevent future incidence thereof"). Thus, Md.Code (1984, 1999 Repl.Vol., 2002 Supp.), § 5–704 of the Family Law Article imposes a duty on health practitioners, police officers, educators or human service workers, to report suspected child abuse or neglect encountered in their professional capacity to the local department, appropriate law enforcement agency or the appropriate institution head,[6] and Md.Code (1984, 1999 Repl.Vol., 2002 Supp.), § 5–705 of the Family Law Article imposes a similar obligation on persons, other than a health practitioner, police officer, educator or human services work-

---

"The purpose of this subtitle is to protect children who have been the subject of abuse or neglect by:

"(1) mandating the reporting of any suspected abuse or neglect;

"(2) giving immunity to any individual who reports, in good faith, a suspected incident of abuse or neglect;

"(3) requiring prompt investigation of each reported suspected incident of abuse or neglect;

"(4) causing immediate, cooperative efforts by the responsible agencies on behalf of children who have been the subject of reports of abuse or neglect; and

"(5) requiring each local department to give the appropriate service in the best interest of the abused or neglected child."

6. Md.Code (1984, 1999 Repl.Vol., 2002 Supp.) § 5-702 of the Family Law Article provides:

"(a) In general.—Notwithstanding any other provision of law, including any law on privileged communications, each health practitioner, police officer, educator, or human service worker, acting in a professional capacity:

"(1) (i) who has reason to believe that a child has been subjected to abuse, shall notify the local department or the appropriate law enforcement agency; or

"(ii) who has reason to believe that a child has been subjected to neglect, shall notify the local department; and

"(2) if acting as a staff member of a hospital, public health agency, child care institution, juvenile detention center, school, or similar institution, shall immediately notify and give all information required by this section to the head of the institution or the designee of the head."

er.[7]

The Legislature understood that the purpose of mandating reporting of child abuse and neglect would be undermined if a person making a good faith report pursuant to FL § 5–704 or § 5–705, that later proved to be false, were to be subjected to civil liability. Consistent with what every state in the nation was doing, see *Harris v. City of Montgomery*, 435 So.2d 1207, 1213 (Ala.1983); *Elmore v. Van Horn*, 844 P.2d 1078, 1082 (Wy.1992); Child Abuse and Neglect State Statutes Series, U.S. Dept. of Health and Human Services, Compendium of Laws: Reporting Laws: Immunity for Reporters (2002), and with national policy, see 42 U.S.C.A. § 5106a (b)(2) (2002), the Legislature intended to encourage the good faith reporting of suspected child abuse to authorities without the fear of civil and criminal liability for reports later determined to be unfounded. *Bentley*, 355 Md. at 323, 734 A.2d at 703 ("The evident purpose behind the statute's grant of immunity to good faith reporters is to instigate the exercise of the duty to report"); *See, Gross v. Haight*, 496 So.2d 1225, 1228 (La.App. 1986) ("It would be most unfortunate if the threat of defamation claims should cast a chilling effect upon the willingness of persons to report suspected cases, where reasonable cause for suspicion exists."); *Liedtke v. Carrington*, 145 Ohio App.3d 396, 763 N.E.2d 213, 216 (2001) ("It is clear that the legislature believed that the societal benefits of preventing child abuse outweigh the individual harm that might arise from the filing of a false report."); *Van Horn*, 844 P.2d at 1084 ("We

---

7. Md.Code (1984, 1999 Repl.Vol., 2002 Supp.), § 5–705 of the Family Law Article provides:

 "(a) In general.—

 "(1) Except as provided in paragraphs (2) and (3) of this subsection, notwithstanding any other provision of law, including a law on privileged communications, a person other than a health practitioner, police officer, or educator or human service worker who has reason to believe that a child has been subjected to abuse or neglect shall:

 "(i) if the person has reason to believe the child has been subjected to abuse, notify the local department or the appropriate law enforcement agency; or

 "(ii) if the person has reason to believe the child has been subjected to neglect, notify the local department."

are obligated to honor the determination of the Legislature that protection of one innocent segment of society warrants occasional injury to another. The mute powerless victims of child abuse have long suffered at the hands of their tormentors. Society's protective voice, the legislature has found, has been silenced by the fear of retaliation. The protection of the young victim, the legislature has determined, requires that uncompensated injury occasionally result to an adult.")(quoting *Thomas v. Chadwick*, 224 Cal.App.3d 813, 827, 274 Cal. Rptr. 128, 138 (1990)). Consequently, at the same time that it mandated reporting, the General Assembly granted statutory immunity from civil and criminal liability to "[a]ny person *who in good faith* makes or participates in making a report of abuse or neglect under § 5–704 or 5–705 of the Family Law Article or participates in an investigation or a resulting judicial proceeding." Md.Code (1974, 2002 Repl.Vol.), § 5–620 of the Courts & Judicial Proceedings Article (emphasis added). *See also* Md.Code (1984, 1999 Repl.Vol.), § 5–708 of the Family Law Article, which provides: "[a]ny person who makes or participates in making a report of abuse or neglect under § 5–704 or § 5–705 of this subtitle or participates in an investigation or a resulting judicial proceeding shall have the immunity described under § 5–620 of the Courts and Judicial Proceedings Article from civil liability or criminal penalty."

■ The term "abuse" is defined in the statute to include "sexual abuse of a child, whether physical injuries are sustained or not." FL § 5–701(b)(2) (Supp.2002). *See, Runge v. State*, 78 Md.App. 23, 552 A.2d 560, *reversed on other grounds, State v. Runge*, 317 Md. 613, 566 A.2d 88 (1989). The photographing of a nude child for one's own benefit or advantage can constitute sexual abuse under Maryland law. *See, e.g., Brackins v. State*, 84 Md.App. 157, 161–62, 578 A.2d 300, 302 (1990). Interpreting Maryland Code (1957, 1987 Repl.Vol.), art. 27, § 35A(a)(4)(i) [8], which defined "sexual child abuse" as

---

**8.** Maryland Code (1957, 1987 Repl.Vol.), art. 27, § 35A(a)(4)(i) was redesignated as Maryland Code (1957, 1991 Cum.Supp.) art. 27, § 35C and subsequently repealed by the Maryland General Assembly by Acts

"any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child," *id.*, the Court of Special Appeals held:

> "To be convicted of exploitation and, therefore, child abuse, threats, coercion, or subsequent use of the fruits of the acts are not necessary. The State need only prove, beyond a reasonable doubt, that the parent or person having temporary or permanent custody of a child took advantage of or unjustly or improperly used the child for his or her own benefit."

*Id.* at 162, 578 A.2d at 302.

■ Although critically important to its application in a given factual situation, the statutes do not define "good faith." Under well settled rules of statutory construction, however, its meaning can be discerned. The term should be given its plain and ordinary meaning. *See, Dyer v. Otis Warren Real Estate Co.*, 371 Md. 576, 581, 810 A.2d 938, 941 (2002); *Chesapeake and Potomac Telephone Co. of Maryland v. Director of Finance for Mayor and City Council of Baltimore*, 343 Md. 567, 578, 683 A.2d 512, 517 (1996) ("we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, we end our inquiry there also"); *see also, Oaks v. Connors*, 339 Md. 24, 35, 660 A.2d 423, 429 (1995); *Montgomery County v. Buckman*, 333 Md. 516, 523, 636 A.2d 448, 451 (1994); *Purnell v. State Bd. of Education*, 125 Md. 266, 270, 93 A. 518, 520 (1915). Using that rule as a guide, the Court of Special Appeals has interpreted the "good faith" requirement of FL § 5–708. *See, Catterton v. Coale*, 84 Md.App. 337, 579 A.2d 781 (1990). It reasoned:

> "Good-faith" is an intangible and abstract quality that encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to

---

2002, ch. 26, § 1, effective October 1, 2002. The current provision is found at Maryland Code (2002), § 3–602(a)(4)(1) of the Criminal Law Article.

seek an unconscionable advantage. Black's Law Dictionary 623 (5th ed.1979). To further illuminate the definition of "good-faith," we have found it most instructive to compare the definition of "bad-faith." "Bad-faith" is the opposite of good faith; it is not simply bad judgment or negligence, but implies a dishonest purpose or some moral obliquity and a conscious doing of wrong. *Vickers v. Motte*, 109 Ga.App. 615, 137 S.E.2d 77, 80 (1964) (citing *Spiegel v. Beacon Participations*, 297 Mass. 398, 8 N.E.2d 895, 907 (1937)). Though an indefinite term, "bad-faith" differs from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with a furtive design. *New Amsterdam Cas. Co. v. Nat'l, etc., Banking Co.*, 117 N.J.Eq. 264, 175 A. 609, 616 (Ch.1934), aff'd, 119 N.J.Eq. 540, 182 A. 824 (N.J.Err. & App.1936). Thus, we would infer that the definition of "good-faith" under § 5–708 means with an honest intention."

*Id.* at 342, 579 A.2d at 783. We agree. Under that definition, to be entitled to the statutory immunity, a person must act with an honest intention (i.e. in good faith), not simply negligently, in making or participating in the making of a report of abuse or neglect under § 5–704 or 5–705 of the Family Law Article or when participating in an investigation or resulting judicial proceeding.

This definition of "good faith" is consistent with that employed by other courts that have interpreted the term in this context. In *B.W. v. Meade County*, 534 N.W.2d 595, 598 (S.D.1995), the Supreme Court of South Dakota, interpreting "good faith," as used in a statute similar to Maryland's,[9] defined it as follows:

---

9. SDCL 26–8A–14, in effect at the time, provided, in pertinent part:

 "Any person or party participating in good faith in the making of a report ... pursuant to § § 26–8A-3 to 26–8A–8, inclusive, or pursuant to any other provisions of this chapter, is immune from any liability, civil or criminal, that might otherwise be incurred or imposed ... Immunity also extends in the same manner ... to public officials or employees involved in the investigation and treatment of child abuse or neglect...."

"Within the bounds of our statute, negligence and lack of good faith are not equivalent. Simply put, if good faith immunity can be overcome by establishing negligence, then good faith immunity is a meaningless concept as one would have to be free from negligence, and thus not liable in any event, to also avail one's self of the doctrine of good faith immunity. Acting in good faith denotes performing honestly, with proper motive, even if negligently. *See* BLACK'S LAW DICTIONARY 693 (6th ed.1993); SDCL 55–7–3; *Isaac v. State Farm Mut. Auto. Ins. Co.*, 522 N.W.2d 752 (S.D.1994). The standard for determining good faith is a defendant's honest belief in the suitability of the actions taken. *Mackintosh v. Carter*, 451 N.W.2d 285 (S.D.1990). Thus it is immaterial whether a person is negligent in arriving at a certain belief or in taking a particular action. As there was no genuine issue of material fact to dispute good faith, summary judgment was appropriate."

*See Purdy v. Fleming*, 655 N.W.2d 424, 433–34 (S.D.2002); *Cotton v. Stange*, 582 N.W.2d 25, 28 (S.D.1998). *See also Zamstein v. Marvasti*, 240 Conn. 549, 692 A.2d 781, 786 (1997) ("imposing upon mental health professionals, who have been engaged to evaluate whether there has been sexual abuse, a duty of care running to the benefit of the alleged sexual abuser would be contrary to the public policy of this state," reviewing the Connecticut child abuse reporting statute); *Garvis v. Scholten*, 492 N.W.2d 402, 404 (Iowa 1992) ("Good faith in section 232.73 rests on a defendant's subjective honest belief that the defendant is aiding and assisting in the investigation of a child abuse report. Negligence in forming or acting on that belief is irrelevant to the good faith determination."); *Myers v. Lashley*, 44 P.3d 553, 563–64 (Ok.2002) ("The element of scienter ...—that of guilty knowledge—is an indispensable ingredient in the pattern of proof required to show lack of good faith"); *Van Horn*, 844 P.2d at 1083 ("We hold that W.S. 14–3–209 provides immunity, though negligence may be involved in reporting, for the report may still be made in good faith."); *Trear v. Sills*, 69 Cal.App.4th 1341, 82 Cal. Rptr.2d 281 (1999), (review denied May 12, 1999) ("therapist's

duty does not extend beyond the patient to include someone who the therapist in good faith (even if negligently) concludes abused his or her patient"); *Michaels v. Gordon,* 211 Ga.App. 470, 439 S.E.2d 722, 725 (1993)("Bad faith" is more than simply bad judgment or negligence, it implies a dishonest purpose or some moral deviance); *Doe v. Winny,* 327 Ill. App.3d 668, 261 Ill.Dec. 852, 764 N.E.2d 143, 154 (2002) ("a plaintiff must show more than mere negligence to create a question of fact as to a reporter's good faith. To raise a question of fact, the plaintiff must show that the reporter has acted maliciously, dishonestly, or for some improper purpose"); *But see Tyner v. Department of Soc. & Health Servs., Child Protective Servs.,* 141 Wash.2d 68, 1 P.3d 1148, 1159 (2000) (rejecting argument that a Child Protective Services worker should be held to a "good faith" standard as opposed to a negligence standard).

### A.

 A party is entitled to summary judgment when that party establishes that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Maryland Rule 2–501(e). Reviewing a grant of summary judgment involves determining whether a genuine dispute of material fact exists, *Gross v. Sussex, Inc.,* 332 Md. 247, 255, 630 A.2d 1156, 1160 (1993); *Beatty v. Trailmaster,* 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993); *Heat & Power Corp. v. Air Prod. & Chem., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990), and "whether the trial court was legally correct." *Heat & Power Corp., supra,* 320 Md. at 592, 578 A.2d at 1206 (1990) (citations omitted). Furthermore, the summary judgment procedure is not a substitute for trial, *Mayor & City Council of Baltimore v. Ross,* 365 Md. 351, 359, 779 A.2d 380, 384 (2001); *Goodwich v. Sinai Hosp. of Baltimore, Inc.,* 343 Md. 185, 205, 680 A.2d 1067, 1077 (1996); thus, it is not the office of summary judgment to try the case or to resolve factual disputes, *Coffey v. Derby Steel Co., Inc.,* 291 Md. 241, 247, 434 A.2d 564, 568 (1981), and certainly not the credibility of the witnesses. *Impala Platinum Ltd. v. Impala*

*Sales, Inc.* 283 Md. 296, 326, 389 A.2d 887, 905 (1978). The party opposing a motion for summary judgment must produce admissible evidence to show that a genuine dispute of material fact, i.e., one "the resolution of which will somehow affect the outcome of the case," *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608, 614 (1985), does exist. *Scroggins v. Dahne,* 335 Md. 688, 691, 645 A.2d 1160, 1161 (1994); *Beatty, supra,* 330 Md. at 737, 625 A.2d at 1011. This requires more than "general allegations which do not show facts in detail and with precision." *Beatty,* 330 Md. at 738, 625 A.2d. at 1011; *Lynx, Inc. v. Ordnance Products,* 273 Md. 1, 7–8; 327 A.2d 502, 509 (1974); *Brown v. Suburban Cadillac, Inc.,* 260 Md. 251, 255, 272 A.2d 42, 44 (1971). Moreover, factual disputes, and the inferences reasonably to be drawn from the facts, are resolved in favor of the party opposing summary judgment and against the moving party. *Frederick Rd. Ltd. Partnership v. Brown & Sturm,* 360 Md. 76, 94, 756 A.2d 963, 972 (2000); *Dobbins v. Washington Suburban Sanitary Comm'n,* 338 Md. 341, 345, 658 A.2d 675, 677 (1995).

The Court of Special Appeals correctly noted that questions involving determinations of good faith which involve intent and motive "ordinarily" are not resolvable on a motion for summary judgment. *See, Gross, supra,* 332 Md. at 256, 630 A.2d at 1160, citing, *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458, 464 (1962). *See, also DiGrazia v. County Executive,* 288 Md. 437, 445, 418 A.2d 1191, 1196 (1980). The Court of Special Appeals has also held that summary judgment was inappropriate in a case involving defamation, false imprisonment, malicious prosecution and abuse of process. *Laws v. Thompson,* 78 Md.App. 665, 669–687, 554 A.2d 1264, 1266–1275 (1989). And in *Coale, supra,* the intermediate appellate court determined that it was error to dismiss, on the basis of FL § 5–708's statutory immunity, the appellant's negligence and malicious prosecution actions against a social worker, who conducted an investigation resulting in the appellant's prosecution for child abuse, when the question of her good faith remained in issue. 84 Md.App. at 343, 579 A.2d at 783.

On the other hand, we have stated that "even in cases involving intent and motive, if the prerequisites for summary judgment are met—there [being] no material dispute of fact— summary judgment may be granted. *Gross, supra,* 332 Md. at 257, 630 A.2d at 1161; *Driver v. Potomac Electric Power Co.,* 247 Md. 75, 79, 230 A.2d 321, 325 (1967).

In the case *sub judice,* the trial court resolved all inferences from the record against the petitioners, as the moving party, and concluded that there was no genuine dispute of material fact, warranting trial. The Court of Special Appeals agreed with respect to the counts other than the defamation count and the breach or invasion of privacy counts.

The respondents do not agree. They submit that they have offered evidence to rebut the petitioners' claim of good faith reporting. In an attempt to ascribe, and justify, a sinister motive to Mr. Rosiak's actions in reporting the contents of the photographs, the respondents have fashioned a number of general allegations, hypothetical scenarios and alternative courses of action that Mr. Rosiak could, and they contend, should, have taken before reporting suspected child abuse based on the photographs. None of these allegations address directly the state of mind of Mr. Rosiak with respect to the content of the photographs. The respondents do not attempt to allege that Mr. Rosiak knew, or had reason to know, that the photographs did not depict child abuse and made a report of suspected child abuse in spite of that knowledge. Nor do they contend that Mr. Rosiak misstated or mis-characterized what he saw on the photographs, either to the police or to anyone else, or that he made untruthful or reckless remarks with regard to their content.

The respondents note, instead, that Mr. Rosiak did not strictly abide by a Rite Aid internal-company memorandum which outlined the procedure for dealing with sexually explicit photographs.[10] In addition, the respondents complain that

---

**10.** The internal-company memorandum instructs Rite Aid employees to destroy photographs deemed "sexually explicit." The memorandum

Mr. Rosiak did not discuss the matter with Mr. Hagley in private, before deciding what to do, although he did discuss the photographs privately with the police officers. The respondents also characterize as evidence of bad faith, Mr. Rosiak's exclusion of Mr. Hagley from the private discussion he had with the police. The respondents contend that if Mr. Rosiak were truly interested in protecting a possible victim of child abuse, he would not have left Mr. Hagley, the potential abuser, alone in the store while making the report to the police, where Mr. Hagley was free to "possibly escape the scene." (Appellees' Brief at 18). And the fact that Mr. Rosiak, although viewing it as odd, did not inform the police that Mr. Hagley had brought the child's mother to the store to resolve the misunderstanding is further indication, they argue, of the his lack of good faith. Finally, the respondents argue that Mr. Rosiak's bad faith can be inferred because he set Mr. Hagley up to be arrested by instructing him to return to the store at 1:00 p.m. and having the police arrive virtually simultaneously. Collectively, these acts, the respondents maintain, could lead a reasonable juror to infer that Mr. Rosiak was not interested in disclosing all sides of the story to the police or that he harbored an ill motive toward Mr. Hagley, and, consequently, was not acting in good faith.

We, however, are at a loss to discern how any of these facts, whether considered singly or collectively, could lead to an inference that Mr. Rosiak lacked good faith in reporting suspected child abuse. As the Court of Special Appeals pointed out:

"Those assertions do not ... give rise to any reasonable inference that Rosiak did not honestly believe that the photographs were suggestive of child pornography or child abuse. He did not know Hagley; there was no suggestion of any fact that might even suggest a motive, other than a belief that the photographs depicted a form of child abuse,

---

further states that Rite Aid employees shall not "keep, reprint or show another individual any photograph processed at a Rite Aid lab, which is deemed sexually explicit."

for Rosiak to call the police. Rosiak's conduct toward Hagley after he saw the photographs might suggest feeling of anger, disgust, or perhaps revulsion, but such emotions can only be explained as reactions to what Rosiak believed that the photographs depicted."

This is to be contrasted with the allegations in *Thompson* and *Coale*. In *Thompson,* there was a dispute of fact concerning the circumstances of an arrest and aborted prosecution, from which inferences of actual malice and bad faith could be drawn. In *Coale,* there was an assertion that the social worker fabricated a report of a polygraph test, which presented the question of her good faith in conducting a child abuse investigation.

What the respondents' general allegations do indicate is that there were other alternatives available to Mr. Rosiak for handling the situation and that, perhaps, it could have, and probably, should have been handled better. But the availability of other alternatives, and the possibility, even probability, that the situation might have, or should have, been handled more effectively and sensitively, while perhaps suggesting negligence, does not equate to bad faith or a lack of good faith. And, as we have seen, negligence is not sufficient to negate good faith. *See Coale, supra,* 84 Md.App. at 342, 579 A.2d at 783. What steps Mr. Rosiak could have taken is not determinative; what actions Mr. Rosiak did, in fact, take is the determinative question.

Whether Mr. Rosiak strictly followed the Rite Aid policy in dealing with the photographs cannot rebut his claim of good faith in reporting his suspicion that the photographs depicted child abuse. Mr. Rosiak certainly could have timed his call to the police differently; however, that he did not does nothing to establish that he did not act in good faith in making the report of suspected child abuse.

Furthermore, Mr. Rosiak's discussion of the photographs with the police officers in a private office casts no light whatsoever on his motive in reporting what he believed to be suspected child abuse. The fact that Mr. Rosiak main-

tained a private office in the store is only relevant to show that he had an alternative forum for discussing the matter with Mr. Hagley and, thus, could have avoided the allegedly defamatory speech. The maintenance of a private office is not relevant, however, to show that Mr. Rosiak did not act in good faith or whether the allegedly defamatory speech is immune from suit under the statutes. Moreover, although Mr. Rosiak may have thought it was odd for Mr. Hagley to return with the child's mother to explain the photographs, his failure to disclose that fact to the police, again, is not suggestive of a lack of good faith. Mr. Rosiak was certainly under no duty to convey the suspected child abusers' explanation of the photographs to the authorities. *See, Hall v. Van's Photo, Inc.*, 595 So.2d 1368, 1370 (Ala.1992)("we conclude that [the reporter] did not have a duty under the Child Abuse Reporting Act to include [the suspect's] explanation in the report"). The immunity statutes do not require a reporter of suspected child abuse to verify every detail of the suspected conduct or perfectly recount all that he or she is told in order to be found to have acted in good faith when making the report. The statutes simply require that the reporter make a report in good faith. Thereafter, law enforcement or the appropriate department of social services personnel are charged with investigating the facts surrounding that report.

For the respondents to oppose the summary judgment motion successfully, they must have made a showing, supported by particular facts sufficient to allow a fact finder to conclude that Mr. Rosiak lacked good faith in making the report of suspected child abuse. They might have done so by producing specific facts showing that Mr. Rosiak knew, or had reason to know, that the photographs did not depict a form of child abuse and, in total disregard of that knowledge, filed a report anyway. What the respondents have produced are general allegations, that simply show that all of Mr. Rosiak's actions in making the report can be second guessed. Legitimizing this sort of Monday-morning quarterbacking would render the immunity conferred by CJ § 5–620 and FL § 5–708 essentially useless. The Court of Special Appeals correctly

affirmed the trial court's grant of summary judgment as to Count II, false imprisonment; Count III, malicious prosecution; Count IV–A, Negligence; Count IV–B, Negligence of Defendant Rosiak (with Defendant Rite Aid liable under the rule of respondeat superior); Count IV–C, Breach of contractual duty; and Count IX (relating to the claim by Kerwyn Hagley and Ms. Martin for Kerywn's detainment by social services).

## B.

As we have seen, the Court of Special Appeals affirmed only a part of the trial court's grant of summary judgment. The intermediate appellate court believed that the counts alleging various forms of breach or invasion of privacy and defamation were based on conduct by Mr. Rosiak that was not covered under the immunity protection of the statute: slandering Mr. Hagley in front of persons other than police officers (i.e., Rite Aid customers), and showing the photographs, the subject of a report to the police of suspected child abuse, to persons other than police officers. Those counts were remanded to the trial court for further proceedings. The petitioners do not agree; in so ruling, they argue, the intermediate appellate court erred.

Noting the statutory scheme, pursuant to which immunity is given to a reporter who, in good faith, makes, or participates in making, a report of abuse or neglect or participates in an investigation of abuse or neglect or a resulting judicial proceeding and reminding us that his good faith is not in question for the purposes of the Court of Special Appeals' decision, that court having determined that there was no genuine dispute as to that matter, the petitioners posit that the issue is the narrow one of "whether Mr. Rosiak was making or participating in the making of a report of abuse or participating in an investigation of abuse" when he engaged in the conduct deemed exempted. In resolving the issue, the petitioners find it relevant that the photographs were ambiguous and, thus, that a decision as to whether to report them as depicting child abuse, or not, could not be made immediately. Additionally,

the petitioners point to Mr. Rosiak's need to share the photographs with his subordinate and to consult with the Company, and perhaps others,[11] for guidance delayed the decision further and also necessitated that Mr. Rosiak communicate to Mr. Hagley his decision not to return the photographs and the reason therefor. It also is relevant and telling to the petitioners that "[a]ll of the conduct that is alleged against Mr. Rosiak as being wrongful is closely related to the investigation and report both in time and context. None of the conduct occurred, for example, after the police finished their investigation, off the premises of the store, or with anyone not involved in an aspect of the investigation."

The petitioners conclude that all of Mr. Rosiak's conduct was a part of an investigation of abuse, which ultimately resulted in his making a report of suspected abuse. They reason:

> "The investigation and making of the report entailed evaluating the photographs, making a call to the police, holding the photographs until the police arrived, advising Mr. Hagley that he would not be permitted to have his photographs back, and preparing for Mr. Hagley's potential return to the store before the police arrived. Mr. Rosiak's report was completed when the police arrived and the photographs were provided to them for review. All of the conduct complained of by the Hagleys and Ms. Martin occurred in furtherance of the investigation of potential child abuse and of making the report, and all of the conduct happened close in time to the making of the report. It cannot be that a reporter, suspecting child abuse and attempting to do the right thing can be held liable for conduct performed with an honest intent while evaluating the evidence of abuse, securing the evidence of abuse, an awaiting the arrival of the appropriate authorities to complete the report."

---

11. Mr. Hagley testified at his deposition to overhearing Mr. Rosiak ask the security guard what decision he should make with regard to the photographs, to which the security guard responded that he did not want to be involved in that decision.

Notwithstanding its application to the different counts alleged, all of the conduct by Mr. Rosiak in this case was, as the petitioners point out, closely related both in terms of time and subject matter. Thus, what Mr. Rosiak did and the conversations he had with Mr. Hagley all occurred within the space of a few hours, in the Rite Aid store and was concerned with the course of action he should pursue as a result of the contents of some photographs he had developed for Mr. Hagley. What Mr. Rosiak said to Mr. Hagley about what he saw in the photographs had no independent relevance; it was only because of the decision Mr. Rosiak was required to make with respect to reporting suspected child abuse, that the explanation was made. That it was made in the presence of others does not change this basic fact. Neither can the conferring with others concerning the decision to be made separate that fact from the basic issue, whether what Mr. Rosiak observed in the photographs was suspected child abuse, which Mr. Rosiak was legally required to report.

The respondents agree that all of Mr. Rosiak's conduct was related. In their Cross–Petition for Writ of Certiorari, they state:

"In this case, the actions of the defendant, Mr. Rosiak did not undertake a series of unconnected actions, one set of which related only to calling the police while another unconnected set related only to his actions in showing the photograph.

"Rather, the actions taken by Mr. Rosiak were a single series of actions taken through the course of a single morning. As such, each action[ ] bears upon all of the other actions taken as part of that morning's event."

 We agree with the petitioners that the Court of Special Appeals has interpreted the child abuse reporting statutes too narrowly. First, the statutes cover more than making a report. They recognize that individuals, other than the reporter, may play a role in the making of the report, although they may not themselves make it. In addition, the statutes cover investigations and resulting judicial proceed-

ings. As the Court of Special Appeals interprets those statutes, a reporter, admittedly acting in good faith in making a report of suspected child abuse, may nevertheless be held liable civilly if, during the course of deciding whether to make a report, he or she mentions the nature of the concern he or she has and happens to do so, perhaps negligently, in the presence of someone other than a police officer, or seeks the advice of someone other than a police officer to assist in the decision making. Thus, the intermediate appellate court does not seem to take into account the breadth of the statutes or give effect to any of the conduct warranting immunity, except reporting. Such an interpretation and result, fly in the face of the purpose of the statutes and undermine the statutes' effectiveness; reports of suspected child abuse, in the case of ambiguous conduct, as in this case, either will not be filed or, if they are, they will be filed without the careful consideration allegations based on ambiguous conduct deserve to, and should, receive.

We hold that the Court of Special Appeals erred in reversing the judgment of the trial court with respect to the counts alleging various forms of breach or invasion of privacy and defamation.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.**