**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 10-1318**

CAPITOL RADIOLOGY, LLC,

        Plaintiff - Appellant,

    v.

SANDY SPRING BANK,

        Defendant - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Deborah K. Chasanow, Chief District
Judge.  (8:09-cv-01262-DKC)

Argued:  May 13, 2011          Decided:  July 20, 2011

Before GREGORY, WYNN, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion.  Judge Diaz wrote the opinion,
in which Judge Gregory and Judge Wynn joined.

**ARGUED:** Michael John O'Rourke, O'ROURKE & MOODY, Chicago,
Illinois, for Appellant.  James Taylor Heidelbach, GEBHARDT &
SMITH, LLP, Baltimore, Maryland, for Appellee.  **ON BRIEF:** Steven
R. Freeman, FREEMAN, WOLFE & GREENBAUM, P.A., Towson, Maryland,
for Appellant.  Patrick J. Madigan, GEBHARDT & SMITH, LLP,
Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

Capitol Radiology, LLC ("Capitol") appeals a decision of the district court granting summary judgment in favor of Sandy Spring Bank ("Sandy Spring"). Capitol sued Sandy Spring for breach of contract after Sandy Spring declared Capitol in default and accelerated Capitol's payments on a commercial line of credit and equipment loan. Even when viewing the evidence in the light most favorable to Capitol, Sandy Spring did not breach the loan agreement because the bank had a good faith belief that it was insecure. Accordingly, we affirm.

I.

A.

Capitol is a radiology practice formed by Dr. Doriann Thomas in January 2005. Shortly after its formation, Capitol sought financing from Sandy Spring. In March 2005, Sandy Spring issued Capitol a $225,000 equipment loan and a commercial line of credit of up to $435,000. The loans were secured by Capitol's inventory, chattel paper, accounts, equipment, and general intangibles. As additional collateral, Dr. Thomas provided a junior lien against her residence and guaranteed both loans.

2

Capitol owed payment in full on the equipment loan by September 2, 2008, while the line of credit was initially payable May 31, 2006.  Sandy Spring extended the term of the line of credit four times.  With each extension, the parties executed a new Business Loan Agreement.  The final Business Loan Agreement was dated October 22, 2007 ("Loan Agreement").  Pursuant to the terms of the final extension, Capitol owed payment in full on the line of credit by August 31, 2008.

The Loan Agreement enumerated several events of default.  As is relevant here, the Loan Agreement stated as follows:

> Each of the following shall constitute an Event of Default under this Agreement:
>
> ***
>
> **Adverse Change.**  A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.
>
> **Insecurity.**  Lender in good faith believes itself insecure.

J.A. A345.

Capitol made timely payments on the equipment loan and the line of credit.  The Loan Agreement, however, also required Capitol to furnish financial statements or other information as requested by Sandy Spring.  As early as mid-2006, Capitol either

3

wholly failed to provide or was delayed in providing such information.

Roger Hanson was the Sandy Spring vice president and commercial portfolio manager responsible for the Capitol relationship. Between April 2006 and May 2008, Hanson sent several emails and letters to Capitol and Dr. Thomas requesting financial information, including tax returns, financial statements, and accounts receivable reports. Hanson also corresponded with Larry McKenney, Capitol's chief financial officer, regarding the requests. In addition, Hanson met with McKenney and Capitol's accountant on multiple occasions to discuss the loans and Sandy Spring's need for financial information.

In an August 2006 email, Hanson explained that Sandy Spring was "anxious" for financial information requested weeks earlier from Capitol. Id. A325. Hanson warned Dr. Thomas that Sandy Spring "may have to start pursuing other measures" if Capitol did not timely comply with Sandy Spring's requests. Id. As a result of Capitol's delay in providing financial information, Sandy Spring added Capitol to its watch list of risky borrowers in September 2006. A separate "Watch Report"-- prepared by Sandy Spring for borrowers on its watch list--also noted that "[d]ebit card purchases on [Capitol's] corporate account appear to not be business related." Id. A455.

4

In January 2007, Hanson again requested Capitol's 2006 financial information. Hanson told Capitol's accountant and Dr. Thomas that he had "been waiting most of the latter part of 2006 for something." Id. A329. In the same correspondence, Hanson stated that Sandy Spring could not "renew the line or restructure anything until [he] saw how 2006 went." Id.

In May 2007, Hanson again wrote Dr. Thomas to express his frustration at Capitol's failure to provide requested information. In the letter, Hanson told Capitol that Sandy Spring did not intend to renew Capitol's line of credit:

> This letter is to inform you that the bank is not interested in renewing the line of credit for another year. Over the last year or so we have made repeated attempts to collect information on the line of credit but have never obtained enough information to renew the line. This process involved quite a bit of my time and efforts. . . . Please be advised that we will issue the last extension on the current line of credit for 60 days to allow you to obtain financing of your facility elsewhere.

Id. A342.

The parties later met to discuss the relationship and a possible extension of the line of credit. Following the meeting, Sandy Spring received sufficient financial information to allow the bank to offer Capitol an extension. Capitol accepted the extension--the final one as it turned out-- extending the due date of the line of credit to August 31, 2008.

5

In April 2008, Sandy Spring learned of a judgment against Capitol and Dr. Thomas in a Maryland state court case, Capital Med. Mgmt. Assocs., LLC v. Thomas, No. 273430-V (Md. Cir. Ct. Apr. 18, 2008) ("CMMA judgment"). The CMMA judgment-- including damages, attorneys' fees, and costs--totaled $179,749.16. Sandy Spring also discovered a $28,165 federal tax lien against Dr. Thomas's residence. The Loan Agreement required Capitol to provide Sandy Spring written notification of any litigation that could materially affect Capitol's financial condition. There is no evidence that Capitol took action to notify Sandy Spring of either the CMMA judgment or the tax lien.

On April 28, 2008, following discovery of the CMMA judgment and tax lien, Sandy Spring declared Capitol in default of its obligations under the Loan Agreement. Sandy Spring demanded immediate payment of both loans and advised Capitol that it would exercise its rights and remedies under the Loan Agreement if Capitol failed to pay.

At Capitol's request, Hanson and his team leader Randy McVey met with McKenney on May 9, 2008 to discuss the default. At the meeting, McKenney asked Sandy Spring to reconsider, contending that the CMMA judgment would be overturned on appeal and that Capitol had sufficient funds to cover the judgment if it were ultimately enforced. Following the meeting, Hanson

6

wrote McKenney and Dr. Thomas requesting additional financial information, which he never received.

Sandy Spring subsequently discovered that Capitol's corporate account was overdrawn on several occasions in May and June 2008. A review of the account also revealed that Dr. Thomas was using it to pay for personal expenses. During her deposition, Dr. Thomas acknowledged that she used the Capitol account to purchase meals, clothing, and tickets for personal travel.

On July 30, 2008, CMMA took steps to enforce its judgment when it secured a writ of garnishment against Capitol's deposit accounts. The writ of garnishment directed Sandy Spring to freeze Dr. Thomas's and Capitol's accounts pending further direction from the court.

On July 31, 2008, Sandy Spring informed Capitol that the bank had elected to exercise its right of setoff--pursuant to which Sandy Spring would apply funds in Capitol's corporate accounts to its loan obligations. Sandy Spring reiterated that Capitol was in default due to the CMMA judgment and the tax lien and added that "[t]he judgments represent an adverse change in [Capitol's] financial condition and it is believed that the prospect of payment or performance of these Notes are [sic] impaired." Id. A403. Following the notification, Sandy Spring, which had first priority over Capitol's corporate accounts,

7

began to apply the funds in Capitol's accounts to its loans. As a result of the setoff, Capitol's loans were paid in full by September 2008.

B.

Capitol sued Sandy Spring for breach of contract on August 19, 2008 in Maryland state court. On May 14, 2009, Capitol amended its complaint to add an allegation that Sandy Spring discriminated against Capitol on the basis of race in violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f. In response, Sandy Spring removed the case to federal court asserting federal question jurisdiction.

On November 11, 2009, Sandy Spring moved for summary judgment on both the breach of contract claim and the ECOA claim. The district court granted Sandy Spring's motion. Capitol timely appealed, challenging the district court's order on the breach of contract claim only.

II.

We review a district court's decision granting summary judgment de novo, "applying the same standard as the district court." Homeland Training Ctr., LLC v. Summit Point Auto. Research Ctr., 594 F.3d 285, 290 (4th Cir. 2010). Summary judgment is appropriate "if the movant shows that there is no

8

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.

Capitol contends that Sandy Spring breached the Loan Agreement by declaring Capitol in default and accelerating payment of the loans. In support of its claim, Capitol focuses on the adverse change and insecurity clauses in the Loan Agreement. Capitol argues that there are material issues of fact as to whether the CMMA judgment and federal tax lien were material adverse changes or rendered Sandy Spring reasonably insecure. Because the undisputed facts show that Sandy Spring believed in good faith that it was insecure, we affirm the judgment of the district court.

## B.

Consistent with the terms of the Loan Agreement, we apply Maryland law to Capitol's claim. A plaintiff asserting a claim for breach of contract must show "that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." Taylor v. NationsBank, N.A., 776 A.2d 645, 651 (Md. 2001). Maryland follows an objective theory of contract interpretation under which courts apply the plain

9

meaning of unambiguous contract terms. <u>Ocean Petroleum, Co., Inc. v. Yanek</u>, 5 A.3d 683, 690 (Md. 2010). And although the issue of good faith is typically a jury question, summary judgment is appropriate where there are no material disputes as to the facts of the case. <u>David A. Bramble, Inc. v. Thomas</u>, 914 A.2d 136, 149 (Md. 2007); <u>see also</u> <u>Rite Aid Corp. v. Hagley</u>, 824 A.2d 107, 119–21 (Md. 2003) (affirming summary judgment in favor of defendant in case involving allegations that defendant failed to act in good faith).

The Loan Agreement provides that the occurrence of any event of default terminates Sandy Spring's obligations and, at Sandy Spring's option, renders the balance of the loans immediately due and payable. As is relevant here, Capitol is in default under the Loan Agreement if Sandy Spring "in good faith believes itself insecure." J.A. A345. Because the Loan Agreement does not define "insecure" we give the term its "customary, ordinary and accepted meaning." <u>Weichert Co. of Md. v. Faust</u>, 19 A.3d 393, 400 (Md. 2011). In this context, "insecure" means "[h]aving a good-faith belief that the possibility of receiving payment or performance from another party to a contract is unlikely." <u>Black's Law Dictionary</u> 866 (9th ed. 2009).

The trial court concluded as a matter of law that Sandy Spring had a good faith belief that it was insecure. We

10

agree. Sandy Spring declared Capitol to be in default in April 2008 after learning of the CMMA judgment and federal tax lien. Before taking such action, Sandy Spring regularly requested information from several representatives of Capitol, including Dr. Thomas, McKenney, and Capitol's accountant. Capitol either ignored the requests altogether or neglected to respond promptly.

By failing to timely comply with Sandy Spring's requests, Capitol forced the bank to follow up repeatedly for the basic financial information necessary to determine whether to renew Capitol's line of credit. As early as September 2006, Sandy Spring added Capitol to its watch list of risky borrowers based on Capitol's failure to provide requested information, as well as the bank's observation that Dr. Thomas appeared to be using Capitol's corporate account for personal expenses. It is in this context of non-compliance that Sandy Spring learned of the CMMA judgment and tax lien in April 2008.

On appeal, Capitol contends that Sandy Spring did not adequately analyze whether discovery of the CMMA judgment and tax lien represented material adverse changes in Capitol's financial condition. Capitol argues that, at the very least, whether the CMMA judgment and tax lien were material presents a genuine issue of fact that precludes summary judgment.

11

Capitol, however, has no adequate answer to Sandy Spring's contention that the bank had a good faith belief that it was insecure--a wholly separate ground in the Loan Agreement for declaring a default. In fact, Capitol offers no persuasive evidence to suggest that Sandy Spring acted other than in good faith.

Capitol contends that it assured Sandy Spring that its financial condition was secure in the May 9, 2008 meeting following the declaration of default. McKenney testified that he explained to Sandy Spring that Capitol had sufficient funds to cover the $179,749.16 CMMA judgment and that Dr. Thomas was working with her accountant to rectify the tax lien. We agree with the district court, however, that Sandy Spring was not obligated to accept McKenney's verbal assurances that Capitol was financially sound, particularly given Capitol's failures to respond to requests for financial information and to provide notice of the CMMA judgment and tax lien.

We consider Sandy Spring's decision to declare a default, accelerate payment, and exercise its right of setoff in the context of the events surrounding it. Here, the undisputed facts are that Capitol (1) failed repeatedly to honor Sandy Spring's requests for financial information; (2) allowed its principal, Dr. Thomas, to use accounts securing the loans to pay her personal expenses; (3) did not notify Sandy Spring of the

12

CMMA judgment; (4) allowed a writ of garnishment to issue on that judgment against the accounts securing the loans; and (5) failed to report that the guarantor of the loans, Dr. Thomas, was subject to a federal tax lien.

On these facts, we find as a matter of law that Sandy Spring had a good faith belief that it was insecure. Accordingly, Sandy Spring did not breach the Loan Agreement when it took steps to protect its interests by declaring Capitol in default and subsequently exercising its contractual right of setoff.

### III.

For these reasons, we affirm the district court's order granting summary judgment in favor of Sandy Spring.

<u>AFFIRMED</u>

13