# IN THE SUPREME COURT OF IOWA

No. 15–1032

Filed May 19, 2017

Amended August 22, 2017

**TOBY THORNTON,**

Appellee,

vs.

**AMERICAN INTERSTATE INSURANCE COMPANY,**

Appellant.

Appeal from the Iowa District Court for Pottawattamie County, Jeffrey L. Larson, Judge.

Workers' compensation insurer appeals judgment on jury verdict awarding actual and punitive damages after district court on summary judgment found insurer in bad faith as a matter of law. **DISTRICT COURT JUDGMENTS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR NEW TRIAL.**

Mark McCormick and Stephen H. Locher of Belin McCormick, P.C., Des Moines, for appellant.

Tiernan T. Siems, Karen M. Keeler, and MaKenna J. Dopheide of Erickson & Sederstrom, P.C., Omaha, Nebraska, for appellee.

Deborah M. Tharnish and Sarah E. Crane of Davis Brown Law Firm, Des Moines, for amicus curiae Property Casualty Insurers Association of America.

Richard J. Sapp and Ryan G. Koopmans, until withdrawal, of Nyemaster Goode, P.C., Des Moines, for amici curiae Chamber of Commerce of the United States and Iowa Association of Business and Industry.

**WATERMAN, Justice.**

In this appeal, we must resolve a workers' compensation insurer's multipronged challenge to a judgment on a jury verdict awarding $25 million in punitive damages and $284,000 in compensatory damages. The plaintiff was paralyzed below his chest in an on-the-job accident. The insurer disputed whether the employee was permanently and totally disabled (PTD) and contested his petition for a partial commutation (lump-sum) award while it continued to pay full weekly PTD benefits and explore settlement. The Iowa Workers' Compensation Commissioner determined the employee was PTD and granted his petition for partial commutation. The employee sued the insurer for common law first-party bad faith.

On cross-motions for summary judgment, the district court determined the insurer, by contesting PTD and commutation, acted in bad faith as a matter of law by March 11, 2013 (nearly four years after the accident). The court instructed the jury the insurer had acted in bad faith for those actions and instructed the jury to decide whether other actions by the insurer were in bad faith and determine damages. The jury found the insurer's bad-faith conduct began several months after the accident and awarded punitive and compensatory damages at a ratio of 88:1. The insurer appealed after its posttrial motions were denied. The plaintiff cross-appealed the denial of attorney fees incurred prosecuting the bad-faith action. We retained the case.

The insurer argues that (1) it cannot be found in bad faith when it voluntarily and continuously paid stipulated weekly PTD benefits due under its policy, (2) the district court erred by deciding the insurer acted in bad faith as a matter of law, (3) insufficient evidence supports the compensatory damage awards, and (4) the punitive damage award is

unconstitutionally excessive under the Federal Due Process Clause. For the reasons explained below, we conclude the insurer knew or should have known it lacked any reasonable basis to dispute this quadriplegic's PTD status and affirm summary judgment for the plaintiff on that issue. But the district court erred by ruling the insurer was in bad faith as a matter of law for resisting the commutation. It should have granted summary judgment for the insurer on that issue. We reverse the judgments for compensatory and punitive damages without reaching the constitutional challenge and remand the case for a new trial on the remaining bad-faith claims. Applying the American rule, we affirm the district court's ruling denying plaintiff an award of attorney fees incurred prosecuting the bad-faith action.

**I. Background Facts and Proceedings.**

**A. Initial Care.** Thirty-one-year-old Toby Thornton worked as an over-the-road truck driver for Clayton County Recycling (CCR). His job duties included picking up scrap metal in Iowa and Wisconsin and delivering it to CCR's salvage yard. On June 25, 2009, Thornton lost control of his semitruck when the load shifted. The truck rolled over, crushing the cab with Thornton inside. Thornton injured his spinal cord, face, left leg, and ribs. First responders extracted Thornton using the Jaws of Life™. He was rushed by ambulance to Mercy Hospital in Dubuque and airlifted to the University of Iowa Hospitals in Iowa City, where he underwent multiple surgeries. The accident left Thornton permanently paralyzed from the chest down with no use of his left hand and limited use of his right hand.

American Interstate Insurance Company (American Interstate) was the workers' compensation insurer for CCR and specialized in insuring high-risk employers. It learned of Thornton's accident the next day, and

its claims adjuster, Luann Baum, contacted Thornton's wife, Tara, by telephone. On June 27, Baum traveled to the University of Iowa Hospitals and assured Thornton's family that workers' compensation benefits would begin immediately.

Baum gathered wage information and calculated Thornton's weekly benefits, assuming PTD. American Interstate issued the first benefit check to Thornton on July 2 and weekly thereafter. Two weeks after the accident, American Interstate received a medical opinion from Thornton's examining physician that Thornton was PTD. It set reserves for Thornton's care at $762,644, an amount based on PTD. Baum later testified she did so because she "believed that the injury was severe enough . . . to easily classify as a perm total."

Thornton retained counsel for his workers' compensation claim. On July 8, his attorney wrote Baum requesting the "calculations used to arrive at Toby's weekly compensation rate" and a "wage statement for Toby's earnings for the year prior to the injury in accordance with Iowa Code Section 85.40." On August 7, counsel again wrote to Baum, noting Baum had not responded to the prior request. The second letter referred the insurer to Iowa Code section 85.41, which states the failure to furnish wage information upon request within thirty days is a simple misdemeanor. On August 25, counsel sent a third letter to Baum, stating Baum had supplied wage information but had missed the last full week Thornton worked before the accident. On September 1, counsel mailed another letter, again inquiring about weekly wages and requesting medical records. On September 24, counsel for American Interstate responded by letter, stating,

> After we talked on the phone, I obtained the additional wage information from the employer. I recalculated the wage information and changed the rate based on the updated

> information. The new rate will be $513.18 per week. This resulted in a $7.44 per week increase and we had issued 15 weeks so far, so I also issued a check today for an additional $111.60 to bring current.
>
> Here are the weeks and the hours I used for the calculations.

The letter then listed thirteen weeks of wage information, including June 15 to 21, the week missed in the earlier statement. Thornton later stipulated that $513.18 was the correct weekly benefit.

After multiple surgeries and aggressive physical, occupational, and respiratory rehabilitation, Thornton was released from the hospital in October. Thornton moved into his in-laws' home. At Thornton's request, Baum arranged for modifications to make the house handicap-accessible. American Interstate paid to install a shower and hospital bed and specially ordered a wheelchair and van matched to Thornton's height and weight. Thornton told Baum he was pleased, stating, "[V]an was great, equipment is good, bed is a little small for turning, but . . . [the new mattress] should be in by next week."

Initially, Tara provided in-home care to Thornton. In June 2010, Baum arranged for a home healthcare nurse so Tara could return to work. That month, Thornton indicated an interest in purchasing a home, and Baum met with him to discuss housing options. In July, Baum received an email from Thornton that he needed to move out of his in-laws' home "immediately" because he and Tara were separating. Baum arranged for home-aide care, modifications to a new apartment, and for Thornton to take a disabled driver's license test. By November, Thornton had received his driver's license and a van outfitted so he could drive. He reported to Baum he was doing "great" and "ha[d] no complaints at this time." Throughout this period, American Interstate continued to pay Thornton weekly benefits at the PTD rate.

Meanwhile, Thornton's mother passed away. She left him a small inheritance, about $3000, which Thornton used to purchase a headstone for her grave and a TV for his home for his children to watch after school. Thornton complained to his physician that he was depressed. In February 2011, Thornton attempted suicide by overdosing on pain medication. He was admitted to St. Mary's Hospital for inpatient mental health treatment. After his discharge, Thornton received outpatient counseling to cope with his depression. Thornton's treatment records show he attributed his mental problems to his mother's death and his separation from his wife, without mentioning American Interstate. Thornton did not tell Baum about his overdose or mental health treatment. Baum and American Interstate were unaware of Thornton's treatment for depression until months later when bills for payment were submitted.

In March, Dr. Michael Rogge, Thornton's treating physician, concluded Thornton had reached maximum medical improvement (MMI). Thornton told Baum he did not want to discuss settlement options with American Interstate until his divorce was finalized. American Interstate honored his request, continuing to pay him weekly benefits at the PTD rate. In July, when internally discussing Thornton's file, Baum noted she had not assigned a permanent partial disability percentage to Thornton because "[t]his [claimant] is now a quadriplegic. . . . [H]e will be a perm[anent] total case." In January 2012, Thornton contacted Baum and told her his divorce was finalized and he was ready to discuss settlement.

The next month, Baum and John Cantwell, who handles annuities, met with Thornton to discuss settlement. In preparation for this meeting, Baum noted a lump-sum payment would be important to

Thornton because he had been trying to purchase a home. At the meeting, Baum and Cantwell presented Thornton with two alternative proposals for settlement. Each proposal included payment of weekly indemnity benefits (an upfront payment and annuity) and the creation of a Medicare Set Aside (MSA) and Custodial Medical Account (CMA) for future medical expenses. The MSA covered Medicare expenses; if the account was exhausted, the expenses would be picked up by Medicare. The CMA account covered other expenses. If the CMA was exhausted, Thornton would become personally liable for ongoing expenses. Both proposals also included a "Miscellaneous Medical" section, entitling Thornton to an immediate cash payment, a smaller annuity to offset Medicare deductibles, and a series of lump sums for future van purchases.

In both proposals, American Interstate sought a "closed file" settlement to end its liability for future weekly benefits or medical expenses. Upon Thornton's death, any remaining indemnity, MSA, or CMA funds reverted to American Interstate. This structured settlement proposed by American Interstate substantially reduced its own cost of settlement. Thornton understood that "[i]t was just [the] first offer on the table, and [he] wanted to show it to [his] lawyer and get some legal representatives on it."

**B. PTD Claim.** In May, Thornton, through counsel, filed a petition before the Iowa Workers' Compensation Commissioner seeking a determination of permanent total disability. Baum retained counsel for American Interstate, Cory Abbas. Baum disclosed to Abbas that "[American Interstate] ha[d] voluntarily accepted this claim as PTD exposure." In June, Abbas emailed Baum his initial evaluation of the claim, acknowledging that "there is not a strong argument that Claimant

is not a permanent total disability." American Interstate nevertheless denied PTD in its answer to the petition.

Counsel engaged in settlement discussions for several months. Thornton did not want to pursue a closed-file settlement, fearing that the medical funds may run out and he would become personally liable for his healthcare needs. In September, Abbas emailed Tiernan Siems, counsel for Thornton, urging a closed-file settlement for a quicker resolution because, as it could be "2–3 years before a final award is entered (considering potential appeals to the Commissioner, and potentially much longer with appeals to the Courts)." The parties proceeded to mediation in October, where Siems claimed Abbas said American Interstate would "deny, delay, appeal, and drive-up the costs" of litigation if Thornton refused to settle. Abbas denied making such a statement. The mediation was unsuccessful.

American Interstate deposed Thornton in February 2013. Thornton testified that "[s]ome day [he'd] like to get a job" if someone could be found who would employ him "in the condition that [he was] in." On March 4, Abbas contacted Siems and informed him that Phil Davis, a vocational counselor, had been authorized by American Interstate to provide vocational rehabilitative services "if Mr. Thornton ha[d] any interest in such."[1] Siems responded by questioning the motives of Abbas for offering vocational training so close to the hearing on Thornton's PTD

---

[1]This later turned out to be incorrect. Davis actually had been hired by American Interstate to opine whether Thornton could return to some sort of work, not to provide rehabilitative services. Davis submitted a report at the arbitration hearing opining that Thornton could return to work if he so desired. However, Davis later testified that his opinion in no way should have been used to undercut that Thornton was PTD.

claim. Meanwhile, Dr. Rogge informed Abbas that he would not release Thornton to participate in vocational rehabilitation because he was PTD.

On March 11, after conferencing with Dr. Rogge, Abbas emailed Jami Rodgers, who had succeeded Baum at American Interstate. Abbas stated, "Due to Dr. Rogge's opinions not being favorable to our defense, a follow-up written report will not be requested." He added, "As originally evaluated, there really is no possible situation where Claimant is not going to be found to be permanently and totally disabled in this matter." Abbas recommended American Interstate agree to a settlement for PTD and warned that the deputy commissioner may find "the defense unreasonable, issuing sanctions for the costs of the litigation." American Interstate nevertheless elected to proceed with the hearing contesting PTD. Rodgers explained, "[W]e may not have had a reasonable defense, but I still felt we had the right to go to hearing." On May 23, the deputy found Thornton PTD and ordered American Interstate to continue paying Thornton the weekly benefits.

**C. Partial Commutation Claim.** Eleven days later, Thornton petitioned for a partial commutation of benefits. *See* Iowa Code § 85.48 (2013) (allowing partial payment of lump-sum benefits with reduced weekly benefits continuing). He sought commuted benefits in a lump sum of $761,957 to purchase a home, pay attorney fees, and invest with the assistance of a money manager. Siems had emailed Abbas over a week earlier, asking if American Interstate would agree to the partial commutation. Siems accused American Interstate of raising "frivolous defenses suggesting [Thornton] was not [PTD]," despite agreeing that he was likely entitled to a commutation. Abbas responded the next day, stating,

> While I may have agreed/stated that Mr. Thornton has a significant chance of being awarded a partial commutation by a Deputy and the Commissioner (based upon the results of many current partial and full commutation decisions), I never have stated that anyone is "entitled" to a partial commutation.

American Interstate resisted the petition for partial commutation.

In July, Thornton received a letter from a financial advisor, explaining how a lump-sum commutation would be invested to generate a regular monthly income. The plan included a 1.8% annual fee. It also assumed no change in tax treatment, although the investment income would be taxable, unlike weekly workers' compensation payments. In November, Thornton testified at his deposition that he had not previously owned any investments, he and his wife had incurred overdraft charges before the accident, he was only "so-so" with finances, his "[c]redit cards don't get taken care of as good as they should," he connected with this financial advisor through his brother, he had never met with any other financial advisor, he had spent a $3000 inheritance from his mother on bills and "a couple of things," and he had never put together or operated under a monthly budget.[2]

American Interstate retained an expert, Michael Alexander, to address whether the commutation would be in Thornton's best interest. Alexander's report noted Thornton's proposed monthly budget used a

---

[2]Prior to the commutation hearing, American Interstate filed three discovery-related motions against Thornton—all of which were granted by the deputy commissioner. In a September 2013 order granting American Interstate's motion to compel, the deputy characterized Thornton's resistance as resting on "wholly frivolous grounds" that "do little to foster timely and economic resolution of contested case litigation." The deputy granted the insurer's motion to quash a discovery deposition in November, reasoning that Thornton "appears, as defendants contend, to 'fish' for information potentially useful in other litigation." Finally, in March 2014, the deputy granted American Interstate's motion to quash on the basis that "the information sought by [Thornton] is unnecessary to get to the truth and provide the parties rough, speedy justice."

significantly lower housing cost than the anticipated cost of Thornton's home. Even without considering the taxability of investment returns, Alexander noted the lump-sum payment would have to generate a 4.44% annual return to match current weekly payments. Alexander expressed concern about Thornton's ability to avoid tapping into the principal. Alexander concluded, "A sound game plan hasn't been completed to protect or justify this lump sum commutation."

Thornton's counsel asked to depose Alexander. Abbas emailed Rodgers, warning that Alexander's testimony may not help the insurer's resistance:

> Claimant's counsel has requested a deposition of our financial expert, Michael Alexander. He is likely to tear up Mr. Alexander pretty good, as Toby's case presented a difficult position for Mr. Alexander to argue that it was not in his best interests to receive a lump sum versus weekly payments. I will keep you informed as to when the deposition is scheduled, as well as the outcome.
>
> . . . Unfortunately, as we have previously discussed, no matter how well I am able to depose [Thornton's] experts, it will be unlikely to bring forth significant evidence that will sway a Deputy and/or the Commissioner from awarding a commutation.

Alexander testified at his deposition "the crux" of his opinion was that a commutation would not be in Thornton's best interest because he could "take withdrawals whenever he wanted to." But Alexander acknowledged that *if* Thornton avoided invading the principal, commutation would be in his best interest. He noted without the partial commutation, Thornton could be unable to keep up with his expenses:

> Q. There's risk that Mr. Thornton's rent and cost of food will outpace his budget unless he gets a partial commutation. A. Yes. There's also interest rate risk and market risk tied with these investments and liquidity risk if he taps the principal.
>
> . . . .

Q. Notwithstanding all of those risks you mentioned, . . . it is still your opinion as we sit here today that if Mr. Thornton does not invade that principal of this 611- or 751,000 or potentially one million if it had been paid out earlier, [if he] doesn't invade that principal, his best bet is getting that partial commutation? A. Yes.

Q. Even with all those risks we mentioned? A. Yes.

At the partial commutation hearing on March 21, 2014, Thornton presented testimony from two experts that the commutation would be in his best interest. Thornton also presented the budget prepared by his brother, an accountant, showing how Thornton would use the commuted benefits. American Interstate pointed out the proposed budget did not account for taxes or home repair. American Interstate argued Thornton was a poor money manager, noting he had spent the $3000 inheritance without conferring with a financial advisor. It questioned whether Thornton could resist dipping into the principal of any commuted funds and referred to Thornton's children as his "vice."

On May 16, 2014, the deputy granted a partial commutation. The deputy found the risk of Thornton depleting the funds to be "minimal" and stated, "It would be hard to imagine a clearer scenario where a partial commutation should be granted." The deputy further noted, "The arguments of the defendants are weak at best and appear mostly designed to delay the inevitable commutation of benefits." Thornton asked the deputy to award him the costs of both of his experts. *See* Iowa Code § 86.40 (2014) ("All costs incurred in the hearing before the commissioner shall be taxed in the discretion of the commissioner."); Iowa Admin. Code r. 876—4.33 (noting assessment of costs may include "the reasonable costs of obtaining no more than two doctors' or practitioners' reports"). The deputy awarded Thornton costs for two expert witnesses and signaled his disapproval of the insurer's conduct:

> In this case, the defendants refused to agree to a partial commutation and provided a vigorous, albeit weak defense. Partial commutations are fairly rare. Claimant's counsel had to decide how much to invest in pursuing this claim, and it was unknown exactly how much evidence would be required. . . . The defendants essentially forced the claimant to prove his case instead of simply agreeing to what appears to be an obviously reasonable partial commutation in the best interests of the claimant.

American Interstate issued the commutation check one week later and did not appeal the deputy's commutation decision.

Meanwhile, on January 10, 2014, while Thornton's petition for commutation was pending, he learned he had been approved by his bank for a loan to purchase a home. Thornton testified he lost the chance to buy that home because it was sold to another person while he awaited his lump-sum payment.

**D. Alternate Medical Care.** In July, Dr. Rogge wrote Thornton a prescription for a wheelchair replacement. Dr. Rogge wrote in his notes, "Did recommend he receive new wheelchair . . . . We did give him a new script for this today." These notes were received by Rodgers. However, Rodgers did not receive an order or copy of the prescription. Dr. Rogge sent the prescription to St. Luke's Hospital in Cedar Rapids. On September 10, Rodgers was deposed. She stated she did not know Thornton needed a new wheelchair, but if she was "ordered to get him one, she would do so." On September 17, Thornton went to St. Luke's Hospital to be measured. Two days later, Dr. Rogge signed the paperwork setting forth the specifications of the new wheelchair.

On October 12, Thornton was hospitalized for bursitis in both elbows. Hospital records stated that his left elbow was "swollen" and "reddened" and that his pain was "very intense and he felt like his arm was on fire." According to hospital records, Thornton told the hospital

staff he thought "he did bump into something last week with his elbow, but [did] not remember anything specific."

On October 20, Rodgers learned that the wheelchair was "in the process of being ordered." A vendor had inquired about the status of the authorization and copied Thornton's counsel, who then forwarded the email to Abbas. The next day, Thornton filed a petition for alternate medical care. *See* Iowa Code § 85.27(4) ("If the employer and employee cannot agree on such alternate care, the commissioner may, upon application and reasonable proof of the necessity therefor, allow and order other care."). At the hearing on November 4, American Interstate conceded that "a replacement wheelchair is reasonable and necessary" and that it had already "authorized and ordered the wheelchair." The deputy found that "[b]oth parties were in agreement" and ordered American Interstate to provide a new wheelchair.

**E. Bad-Faith Claim.** On December 26, 2013, Thornton filed a civil action against American Interstate alleging common law bad faith based on its handling of his workers' compensation claims. American Interstate filed an answer denying bad faith. After conducting discovery, the parties filed cross-motions for summary judgment. American Interstate argued summary judgment was appropriate because it was undisputed that Thornton was paid full PTD weekly benefits throughout, and that as a matter of law, it acted reasonably in handling Thornton's claims. Thornton argued American Interstate unreasonably denied he was PTD and entitled to commutation, which delayed his lump-sum payment.

The district court partially granted Thornton's motion for summary judgment on the bad-faith claim and denied American Interstate's motion. The court rejected American Interstate's position that bad faith

could not occur without a denial of payment. The court stated, "Any difference between payments owed and payments made is properly a question of damages, not denial." The court acknowledged American Interstate paid Thornton the weekly workers' compensation benefits to which he was entitled, but concluded the insurer denied him benefits when it refused to classify him as PTD, denied PTD status at the hearing, moved for reconsideration of the commissioner's adverse PTD finding, and failed to agree to a commutation. The district court concluded,

> Defendant embarked upon a course of action which first challenged and ultimately denied Plaintiff's PTD status and eligibility for partial commutation, and if successful would have cancelled Plaintiff's benefits. Each of those is a 'denial' within the ambit of the bad faith tort.

The court further determined American Interstate had no reasonable basis for denial. American Interstate was advised by counsel early on that Thornton was likely PTD and a partial commutation was in his best interests. Thus, the court found by March 11, 2013, American Interstate was in bad faith as a matter of law.

The issues of damages and bad faith prior to March 11, 2013, were tried to a jury. Thornton presented evidence on American Interstate's refusal to disclose wage statements and actions in resisting Thornton's PTD claim and partial commutation. Particularly, evidence was presented to the jury that Baum, while working as a claims adjuster for Thornton, had never "uncover[ed] any facts suggesting that Toby was not permanently and totally disabled" or that "the payment of a lump sum, a partial commutation" was not in Thornton's best interest. Similarly, Rodgers testified,

> Q. Now, let's go backwards from that date. From that date up until the inception of this claim, are you aware of any evidence that supported the conclusion that Toby Thornton was not entitled to partial commutation? A. No.

Q. Perm total, same question: From the date of trial all the way back to the date of injury, are you aware of any information supporting the conclusion that Toby Thornton was anything other than permanently and totally disabled? A. No.

Abbas testified that American Interstate acted in good faith because it had a legal right to allow the deputy to decide the issues of PTD and partial commutation. In addition, defense experts described Abbas's statements to opposing counsel—about litigation taking two to three years if the claim did not settle—as a common negotiation tactic, not bad faith.

Both parties presented evidence concerning the delay in Thornton's wheelchair and resulting hospital visit. When asked if the bursitis was caused by the worn wheelchair armrests, Thornton stated, "Hard to tell if it was the armrests or bumping into stuff. Not for sure." Dr. Rogge testified he suspected the arms of the wheelchair were the cause of the bursitis, and he "hope[d]" a new wheelchair would alleviate the problem. Regarding the delay in securing the wheelchair, Rodgers testified,

A. It's my understanding Dr. Rogge sent the order to St. Luke's to work up on—with the wheelchair program, whatever, to get his exact specifications so we could order the wheelchair. And as soon as that was provided with exact orders like a 10-page specification so he could get exactly what he needed, we ordered it.

Q. Reconcile that for me with your sworn deposition testimony in September that you knew nothing about a wheelchair. A. I didn't know anything about the wheelchair at the first deposition. I didn't know anything until you sent me—you [sent] Cory, your e-mail—

Q. Tell us again what Dr. Rogge said about a wheelchair July 1, 2014. A. "His wheelchair is causing problems. It is over five years of age. We did give him a new script for this today."

Q. That's what you received July 15, 2014. A. I could guess July 15. I don't know when we received it.

Thornton acknowledged he needed to go to St. Luke's to be measured before the wheelchair could be ordered because "they had to figure out what [he] needed before it could be ordered."

At the close of the evidence, defense counsel moved for directed verdict, which the district court denied. The jury was instructed that the court had already determined American Interstate committed bad faith by disputing Thornton's PTD status and request for commutation. Instruction No. 1 stated,

> Members of the jury, this trial concerns a claim by Plaintiff, Toby Thornton, that the Defendant, American Interstate Insurance Company, acted in bad faith in failing to pay certain workers' compensation insurance benefits Mr. Thornton was entitled to.
>
> *Prior to this trial, this court determined that the defendant, American Interstate Insurance Company*[,] *committed bad faith in its dealings with Mr. Thornton beginning March 11, 2013.*
>
> It is up to you, the jury, to determine whether the defendant committed bad faith prior to March 11, 2013. It is also your duty to determine whether plaintiff, Toby Thornton, was damaged by defendant's actions and the amount of those damages.

(Emphasis added.) Instruction No. 18 explained the elements of a bad-faith claim, including that the plaintiff was required to prove "[t]here was no reasonable basis for denying the claim." Instruction No. 19 referred back to Instruction No. 18, explaining,

> With respect to proposition No. 2 in the foregoing instruction*, there has been a previous determination by the Court that beginning March 11, 2013, the defendant did not have a reasonable basis for its refusal to pay the Workers' Compensation claim for permanent total disability benefits and for a partial commutation of those benefits.* That determination is binding upon you in this case. The plaintiff does not have to prove this element and the defendant may not contest it. You, the jury, must determine if there was bad faith before March 11, 2013.

(Emphasis added.)

The jury instructions also included an explanation of damages that could be awarded. American Interstate objected to instructions allowing the jury to award damages for past mental pain and suffering, past physical pain and suffering, and loss of equity in the home he had planned to buy. Defense counsel argued, "There's no evidence of that, Judge." The court overruled its objections.

The jury found American Interstate had committed bad faith as of September 1, 2009, a date coinciding with its refusals to give wage information and its internal recognition of PTD. The jury awarded $284,000 in compensatory damages and $25 million in punitive damages. Compensatory damages included past pain and suffering ($125,000), loss of use of money ($14,000), consequential damages for attorney fees in the workers' compensation proceeding ($118,000), and lost home equity ($27,000).

American Interstate moved for judgment notwithstanding the verdict, remittitur, and new trial. American Interstate renewed its argument the district court erred in granting summary judgment and erred in overruling American Interstate's objections to the jury instructions allowing awards for pain and suffering and loss of equity damages. The district court denied the motions. American Interstate appealed, and we retained the appeal.

**II. Standard of Review.**

"We review the trial court's ruling on a motion for directed verdict for the correction of errors of law." *Bellville v. Farm Bureau Mut. Ins.*, 702 N.W.2d 468, 473 (Iowa 2005). "We likewise review a district court ruling on a motion for judgment notwithstanding the verdict for correction of errors at law." *Gibson v. ITT Hartford Ins.*, 621 N.W.2d 388, 391 (Iowa 2001).

"A party moving for summary judgment has the burden of establishing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law." *Johnson v. Farm Bureau Mut. Ins.*, 533 N.W.2d 203, 205–06 (Iowa 1995). "In reviewing both the summary judgment and directed verdict, we review the evidence in the light most favorable to the resisting party." *Id.* at 206. "The court must consider on behalf of the nonmoving party every legitimate interference that can be reasonably deduced from the record." *McIlravy v. N. River Ins.*, 653 N.W.2d 323, 328 (Iowa 2002). Inferences are legitimate when they are "rational, reasonable, and otherwise permissible under the governing substantive law." *Id.* (quoting *Butler v. Hoover Nature Trail, Inc.*, 530 N.W.2d 85, 88 (Iowa Ct. App. 1994)). "If reasonable minds may differ on the resolution of an issue, a genuine issue of material fact exists." *Id.*

We review for correction of errors at law American Interstate's claim that the evidence did not support the jury instructions. *Rowling v. Sims*, 732 N.W.2d 882, 885 (Iowa 2007). "When reviewing a claim that an instruction was not supported by substantial evidence, we view the evidence in the light most favorable to the party seeking the instruction." *Id.* "Questions of jurisdiction, authority, and venue are legal issues to be reviewed for corrections of errors at law." *Kloster v. Hormel Foods Corp.*, 612 N.W.2d 772, 773 (Iowa 2000).

**III. Analysis.**

**A. Bad-Faith Directed Verdict.** We first address whether the district court erred in denying American Interstate's motion for a directed verdict on the bad-faith claim. American Interstate contends the district court erred in granting Thornton partial summary judgment establishing the insurer's bad faith and in submitting the remaining case to the jury.

The insurer notes Thornton did not submit the workers' compensation policy as an exhibit and, it contends, cannot show he was deprived of a benefit "under the policy" or that American Interstate breached any term of the insurance contract. American Interstate argues the bad-faith claim fails as a matter of law because Thornton at all times was paid full weekly PTD benefits. Alternatively, American Interstate argues it had a reasonable basis for resisting commutation because, under Iowa Code section 85.45, the commissioner must approve a partial commutation of benefits.

1. *Error preservation.* Thornton contends error was not preserved. We find error was preserved when American Interstate moved for directed verdict and judgment notwithstanding the verdict, reiterating the grounds asserted in its summary judgment filings. American Interstate consistently asserted substantially the same arguments now made on appeal, i.e., it did not deny Thornton benefits and it had a reasonable basis for resisting commutation. Its arguments were "both raised and ruled upon by the district court." *Tetzlaff v. Camp,* 715 N.W.2d 256, 258 (Iowa 2006). Our precedent requires no more. *See Otterberg v. Farm Bureau Mut. Ins.,* 696 N.W.2d 24, 28 (Iowa 2005) ("[I]f a motion for summary judgment presented the issue to the district court and the district court ruled on it, the rule requiring the district court to first consider issues raised on appeal is satisfied.").[3]

---

[3]Thornton relies on *State v. Ritchison,* 223 N.W.2d 207, 213 (Iowa 1974). In *Ritchison*, a defendant waited until his motion for directed verdict at the close of all evidence to claim that a statute was unconstitutional. *Id.* We held that "in order to preserve for review any alleged error in ruling on the constitutionality of a statute, the party challenging the statute must do so at the earliest available opportunity in the progress of the case." *Id.* at 214. *Ritchison* is inapposite. American Interstate moved for summary judgment well before trial, moved for a directed verdict at the close of plaintiff's evidence, and makes no claim that a statute is unconstitutional.

2. *Did American Interstate deny Thornton a benefit under the policy?*[4]  We begin our analysis with an overview of our insurance bad-faith precedent to provide context for deciding the fighting issue whether a workers' compensation insurer that pays weekly benefits can be found in bad faith.  "Insurance contracts contain an implied covenant of good faith that 'neither party will do anything to injure the rights of the other in receiving the benefits of the agreement.' "  *Johnson*, 533 N.W.2d at 207 (quoting *Kooyman v. Farm Bureau Mut. Ins.*, 315 N.W.2d 30, 33 (Iowa 1982)).  An insured may bring a third-party bad-faith claim when "an insurer's bad faith refusal to settle a third-party's claim against the insured within the policy limits exposes the insured to monetary liability exceeding policy limits."  *Id.*  A first-party bad-faith claim involves "an insured's attempt to recover for his or her own losses allegedly covered under the insurance policy."  *Id.*  We view bad-faith claims by employees against their employers' workers' compensation insurers as *first*-party bad-faith claims, even though "[a]t first blush, a cause of action for bad faith pursued by an employee against an employer's workers' compensation carrier appears to be a matter of 'third-party' bad faith more than one of 'first-party' bad faith."  *McIlravy*, 653 N.W.2d at 329 n.2.

> [W]hen first adopting the bad faith cause of action in the workers' compensation context, we determined that such a suit is more accurately considered as one for first-party bad faith given "the obligations that [the Code] and administrative regulations place on the insurer."

---

[4]Thornton speciously argues a waiver or estoppel resulted from trial testimony by Abbas and William Scherle, an attorney and expert for American Interstate, voicing disagreement with the court's summary judgment ruling.  We cannot fathom how their testimony waived or estopped American Interstate from arguing it was entitled to a directed verdict.

*Id.* (quoting *Boylan v. Am. Motorists Ins.*, 489 N.W.2d 742, 743 (Iowa 1992)).

To establish a first-party bad-faith claim against a workers' compensation insurer, the plaintiff must show "(1) that the insurer had no reasonable basis for denying benefits under the policy and, (2) the insurer knew, or had reason to know, that its denial was without basis." *Id.* at 329 (quoting *United Fire & Cas. Co. v. Shelly Funeral Home, Inc.*, 642 N.W.2d 648, 657 (Iowa 2002)). We have defined "benefit" for purposes of the workers' compensation penalty provision as "[f]inancial assistance that is received from an employer, insurance, or a public program (such as social security) in time of sickness, disability, or unemployment." *Schadendorf v. Snap-On Tools Corp.*, 757 N.W.2d 330, 338 (Iowa 2008) (alteration in original) (quoting *Benefit, Black's Law Dictionary* (7th ed. 1999)) (referring to Iowa Code § 86.13). "The two-part test for first-party bad faith applies . . . [to] workers' compensation [insurance]." *McIlravy*, 653 N.W.2d at 329.

In *Dolan v. Aid Insurance Co.*, we recognized a common law action in tort for bad faith against a first-party insurer because "traditional damages for breach of contract will not always adequately compensate an insured for an insurer's bad faith conduct." 431 N.W.2d 790, 794 (Iowa 1988). We concluded allowing a remedy in tort was "justified by the nature of the contractual relationship between the insurer and insured." *Id.* Insurance policies are contracts of adhesion, exemplifying "inherently unequal bargaining power between the insurer and insured, which persists throughout the parties' relationship and becomes particularly acute when the insured sustains a physical injury or economic loss for which coverage is sought." *Id.* We viewed the "contractual relationship between the insurer and insured [as]

sufficiently special to warrant providing the insured with additional protection." *Id.* at 792.

In *Boylan*, we extended the tort of first-party insurer bad faith to workers' compensation insurers. 489 N.W.2d at 743–44. Robert Boylan alleged his employer's workers' compensation insurer "delayed and then terminated [his] workers' compensation weekly benefits and medical benefits, arbitrarily and capriciously, without notice and in bad faith." *Id.* at 742 (alteration in original). The district court dismissed the action, ruling Boylan failed to state a claim. *Id.* We reversed and reinstated his bad-faith action. *Id.* at 744. We noted the Iowa workers' compensation statute, by imposing a civil penalty on insurers for an unreasonable delay or termination of benefits, demonstrated an "affirmative obligation on the part of the employer and insurance carrier to act reasonably in regard to benefit payments in the absence of specific direction by the commissioner." *Id.* at 743; *see also* Iowa Code § 86.13(4)(*a*) (imposing penalty for "a denial, a delay in payment, or a termination of benefits without reasonable or probable cause or excuse known to the employer or insurance carrier"). We acknowledged the Act's administrative regulations "impose[d] an affirmative obligation to furnish medical and hospital supplies to an injured employee," even though the penalty provision only applied to a denial of weekly compensation benefits. *Boylan*, 489 N.W.2d at 743; *see also* Iowa Code § 85.27(4) ("The treatment must be offered promptly and be reasonably suited to treat the injury without undue inconvenience to the employee."). "As a result of the obligations that these statutes and administrative regulations place on the insurer," we concluded the relationship between a workers' compensation insurer and employee was similar to the special, first-party contractual relationship in *Dolan*. *Boylan*, 489 N.W.2d at 743. Thus, we

recognized a common law first-party bad-faith action against a workers' compensation insurer apart from the statutory penalties provided in section 86.13. *Id.* at 744.

Subsequent cases shaped the contours of common law bad-faith claims in the workers' compensation context. In *Reedy v. White Consolidated Industries, Inc.*, we concluded that self-insured employers could be held liable for common law bad faith because they "voluntarily assume[d] a recognized status under the workers' compensation laws as an insurer." 503 N.W.2d 601, 603 (Iowa 1993). But, in *Bremer v. Wallace*, we declined to expand the claim to *uninsured* employers, focusing on the "common thread" in our previous decisions of "the defendant's status as an insurer." 728 N.W.2d 803, 805 (Iowa 2007). We noted that central to imposing liability for bad faith was "the traditional insurer/insured relationship." *Id.* at 806. The reason "underlying our imposition of tort liability" was "the adhesive nature of the insurance contract." *Id.*

In *McIlravy*, we explained that "[b]ad faith claims are applicable to workers' compensation insurers because they hold the discretionary power to affect the statutory rights of workers, which clearly reflects their obligation to act in good faith in the exercise of this authority." 653 N.W.2d at 329–30 (concluding that commissioner's decision to assess penalty under the statute did not result in issue preclusion in common law bad-faith action because of different burden of proof). Similarly, in *Brown v. Liberty Mutual Insurance*, we held that because a workers' compensation bad-faith claim "rests on Liberty Mutual's alleged breach of its *statutory* good-faith obligation to pay benefits in advance of a specific directive by the industrial commissioner," the five-year statute of limitations in Iowa Code section 614.1(4) applied, rather than the two-

year limitations period in section 614.1(2). 513 N.W.2d 762, 764–65 (Iowa 1994) (emphasis added).

Thus, our decisions indicate it is the nature of the workers' compensation insurer's relationship with the insured employees and corresponding statutory duties that give rise to bad-faith tort liability. For that reason, Thornton was not required to offer American Interstate's insurance contract into evidence at the jury trial. The fighting liability issues concerned American Interstate's conduct in light of its statutory obligations, not the wording of a specific provision of its insurance contract.

But American Interstate argues there can be no bad faith without a breach of a specific policy term. In *Bagelmann v. First National Bank,* we stated parties could not maintain a bad-faith action against their bank when there was no "contract term to which [the bad faith could] be attached." 823 N.W.2d 18, 34 (Iowa 2012). When refinancing their home, the Bagelmanns received a flood risk determination from the bank, stating the property was not in a flood zone. *Id.* at 21. The bank had hired a third party to conduct the flood-zone determination and charged the Bagelmanns a small fee for the service. *Id.* After substantial flooding damaged their home, it was discovered that the property actually *was* in a flood zone. *Id.* at 22. We rejected the Bagelmanns' bad-faith claim, noting,

> An implied duty of good faith and fair dealing is recognized in all contracts. But the covenant does not "give rise to new substantive terms that do not otherwise exist in the contract."
>
> As we have already discussed, the 2003 mortgage . . . authorized the mortgagee to charge for a flood hazard determination. But this section of the mortgage and the determination itself make clear that the determination was for the mortgagee's protection, not the mortgagors'. There was no promise to notify (let alone update) the Bagelmanns

concerning their flood zone status, *so any allegation of bad faith here lacks a contract term to which it can be attached.*

*Id.* at 34 (emphasis added) (citations omitted) (quoting *Mid-Am. Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005)); *cf. Villarreal v. United Fire & Cas. Co.*, 873 N.W.2d 714, 728–29 (Iowa 2016) (concluding first-party bad-faith claim based on denial of insurance benefits arose out of the same conduct as the breach-of-contract claim). Bad-faith claims typically arise from a breach of the insurance contract. *See Bellville*, 702 N.W.2d at 474. Nonetheless, "[d]ue to the unique nature of the insured/insurer relationship, the duty of good faith and fair dealing . . . emanates from the special relationship which exists between the parties, not necessarily from the terms of the contract." Mary G. Leary, 97 Am. Jur. Trials § 211, Westlaw (database updated May 2017).

Courts in other jurisdictions are divided on whether bad faith can be proven without a specific breach of a policy term. *See* 14 Steven Plitt et al., *Couch on Insurance* § 204:20 (3d ed.), Westlaw (database updated Dec. 2016). Some courts hold a breach of contract is a prerequisite to liability for bad faith. *See Karas v. Liberty Ins.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014); *Parks v. Safeco Ins. Co. of Ill.*, 376 P.3d 760, 766 (Idaho 2016); *Dave's Inc. v. Linford*, 291 P.3d 427, 436 (Idaho 2012); *In re United Fire Lloyds*, 327 S.W.3d 250, 254 (Tex. App. 2010); *Brethorst v. Allstate Prop. & Cas. Ins.*, 798 N.W.2d 467, 480 (Wis. 2011). As the California Court of Appeals concluded, "[T]here can be no breach of the implied covenant of good faith and fair dealing if no benefits are due under the policy." *Brehm v. 21st Century Ins.*, 83 Cal. Rptr. 3d 410, 417 (2008). "Absent [a] contractual right [to policy benefits], the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual underpinnings.'" *Id.*

(quoting *Waller v. Truck Ins. Exch., Inc.*, 900 P.2d 619, 639 (Cal. 1995)). In these states, if benefits are "fully and promptly paid" there can be no bad faith "no matter how hostile or egregious the insurer's conduct toward the insured may have been prior to such payment." *Love v. Fire Ins. Exch.*, 271 Cal. Rptr. 246, 255 n.10 (Ct. App. 1990) (emphasis omitted). The covenant of good faith "only 'requir[es] that neither party [to a contract] do anything that will injure the right of the other to receive the benefits of the agreement,' " so if conduct does not affect the parties' contractual rights, there is no bad faith. *Capstone Bldg. Corp. v. Am. Motorists Ins.*, 67 A.3d 961, 987 (Conn. 2013) (alterations in original) (quoting *Home Ins. v. Aetna Life & Cas. Co.*, 663 A.2d 1001, 1008 (Conn. 1995)).

Other courts recognize a claim for bad faith does *not* require a breach of contract. *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 414 (Colo. 2004) (en banc); *Enoka v. AIG Haw. Ins.*, 128 P.3d 850, 862 (Haw. 2006); *LeRette v. Am. Med. Sec., Inc.*, 705 N.W.2d 41, 48 (Neb. 2005). These decisions focus on the special relationship between the insurer and insured as giving rise to the good-faith obligation, rather than the express terms of a contract.

> *[T]he tort of bad faith is* not a tortious breach of contract, but rather *a separate and distinct wrong which results from the breach of a duty imposed as a consequence of the relationship established by contract.* Therefore, the tort of bad faith allows an insured to recover even if the insurer performs the express covenant to pay claims.

*Enoka*, 128 P.3d at 862. This rationale has been used to extend the tort of common law bad faith to workers' compensation insurers. *See Travelers Ins. v. Savio*, 706 P.2d 1258, 1272–73 (Colo. 1985) (en banc) (equating relationship between workers' compensation carriers and

claimants to that of insurer and insured); *Hough v. Pac. Ins.*, 927 P.2d 858, 869 (Haw. 1996) (same).

Under Iowa law, to be liable for common law bad faith, a workers' compensation insurer must have "denied" the employee benefits under the policy. *See Gibson*, 621 N.W.2d at 396. We conclude the requisite "denial" may occur when an insurer unreasonably contests a claimant's PTD status or delays delivery of necessary medical equipment. *Cf. Keystone Nursing Care Ctr. v. Craddock*, 705 N.W.2d 299, 310 (Iowa 2005) (Cady, J., dissenting) ("[A] delay in the payments of benefits can occur . . . when the employer utilizes unreasonable investigative or other stonewalling tactics that needlessly prolong the ultimate payment of benefits . . . ."). This rationale comports with our long-held view that first-party bad faith arises out of the breach of the affirmative good-faith obligations "that [our workers' compensation] statutes and administrative regulations place on the insurer." *Boylan*, 489 N.W.2d at 743.

3. *Did the district court err in deciding American Interstate was in bad faith as a matter of law for resisting PTD status and partial commutation?* To affirm the district court's summary judgment, we must conclude Thornton demonstrated that no genuine issue of material fact existed on two essential elements of his bad-faith claim: American Interstate had no reasonable basis for denying benefits under the policy and knew or had reason to know the denial was without basis. *McIlravy*, 653 N.W.2d at 329. The first element is objective; the second is subjective. *Rodda v. Vermeer Mfg.*, 734 N.W.2d 480, 483 (Iowa 2007). "A reasonable basis for denying insurance benefits exists if the claim is 'fairly debatable' as to either a matter of fact or law." *Id.* (quoting *Gibson*, 621 N.W.2d at 396). A fairly debatable claim is one that is "open to

dispute on any logical basis." *Id.* (quoting *Bellville*, 702 N.W.2d at 473). "Stated another way, if reasonable minds can differ on the coverage-determining facts or law, then the claim is fairly debatable." *Bellville*, 702 N.W.2d at 473.

> The fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. The focus is on the existence of a debatable issue, not on which party was correct.

*Id.* (citations omitted).

Whether an issue of fact is debatable can ordinarily be decided by the court. *Id.* "That is because '[w]here an objectively reasonable basis for denial of a claim *actually exists*, the insurer cannot be held liable for bad faith as a matter of law.'" *Id.* (quoting *Gardner v. Hartford Ins. Accident & Indem. Co.*, 659 N.W.2d 198, 206 (Iowa 2003)). "[C]ourts and juries do not weigh the conflicting evidence that was before the insurer; they decide *whether evidence existed* to justify denial of the claim." *Id.* at 474 (quoting *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. App. 1992)). In many cases, a directed verdict or summary judgment for the insurer dismissing the bad-faith claim may be appropriate because *some* evidence existed to justify its denial as a matter of law. *See, e.g., id.*; *Sampson v. Am. Standard Ins.*, 582 N.W.2d 146, 152 (Iowa 1998) (holding district court properly decided bad faith as a matter of law when insured's injuries were debatable); *Thompson v. U.S. Fid. & Guar. Co.*, 559 N.W.2d 288, 292 (Iowa 1997) (deciding as a matter of law a claim is fairly debatable when evidence showed that claimant ingested drugs the day before his work injury); *Cent. Life Ins. v. Aetna Cas. & Sur. Co.*, 466 N.W.2d 257, 263 (Iowa 1991) (holding motion for directed verdict by insurer should have been granted because of reasonable dispute as to value of claim).

Here, the district court granted summary judgment establishing bad faith in favor of *the insured*, not the insurer. In so doing, the court determined that as a matter of law no reasonable basis existed justifying the denial and the insurer knew or recklessly disregarded that fact by March 11, 2013. "[D]eterminations of good faith which involve intent and motive 'ordinarily' are not resolvable on a motion for summary judgment." *Nelson v. Lindaman*, 867 N.W.2d 1, 13 (Iowa 2015) (quoting *Rite Aid Corp. v. Hagley*, 824 A.2d 107, 119 (Md. 2003)). Bad faith can be established as a matter of law "only when the evidence is undisputed and only one inference can be drawn from the evidence." *McIlravy*, 653 N.W.2d at 333.

First, we address whether there was a reasonable basis for American Interstate's denial that Thornton was PTD. American Interstate does not argue on appeal it had a reasonable basis for denying Thornton's PTD status. Indeed, it would be hard-pressed to do so, since, as early as two weeks after Thornton's accident, it had received opinions from a medical professional and its claims adjustor that Thornton, a quadriplegic, was PTD. *See Bellville*, 702 N.W.2d at 481 ("Certainly there may be cases in which the . . . undisputed damage items [are] so high that there would be no reasonable basis to refuse payment . . . ."). American Interstate internally recognized as much when setting reserves, and its outside counsel expressly recommended that American Interstate concede PTD status. We agree with the district court that contesting Thornton's PTD status under these facts constituted bad faith as a matter of law. *See Arp v. AON/Combined Ins.*, 300 F.3d 913, 917–18 (8th Cir. 2002) (reinstating bad-faith claim against workers' compensation insurer because "[t]he medical evidence . . . conclusively demonstrates that James has been permanently and totally disabled since the date of

his accident" and "[b]y denying James's status . . . AON forced the Arps to hire attorneys to litigate this issue before the South Dakota Department of Labor, when this was completely unnecessary.").

The district court, however, went too far in criticizing American Interstate for offering to settle Thornton's PTD claim with a closed-file Medicare set-aside account and an annuity. The district court stressed these payments "would end for all time [American Interstate's] responsibilities with respect to Plaintiff's claim" and found that the settlement offer would give Thornton "less than that to which [American Interstate] knew he was entitled." We do not view such settlement negotiations as bad-faith conduct. To the contrary, such structured settlements can be mutually beneficial to claimants and insurers.

Iowa Code section 85.35 specifically contemplates closed-file settlements. Iowa Code § 85.35(3) ("The parties may enter into a compromise settlement of the employee's claim to benefits as a full and final disposition of the claim."). These settlements must be approved by the workers' compensation commissioner. *Id.* § 85.35(1). According to the Centers for Medicare and Medicaid Services (CMS), "[t]he recommended method to protect Medicare's interests" in a workers' compensation settlement is a Medicare set-aside account. *Workers' Compensation Medicare Set Aside Arrangements*, Ctrs. for Medicare & Medicaid Servs., https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Workers-Compensation-Medicare-Set-Aside-Arrangements/WCMSA-Overview.html (last visited Apr. 19, 2017).[5] Set-

---

[5]The CMS also offers to review and approve a Medicare set-aside proposal for reasonableness. *See Workers' Compensation Medicare Set Aside Arrangements*, Centers for Medicare & Medicaid Servs., https://www.cms.gov/Medicare/Coordination-of-Benefits-and-Recovery/Workers-Compensation-Medicare-Set-Aside-Arrangements/

aside funds are secure and unaffected by any future financial difficulties of the insurer. Additionally, an annuity offers a lower up-front cost to the insured, which lowers costs overall and allows win-win settlements. An annuity may offer some tax benefits to the claimant. *See W. United Life Assurance Co. v. Hayden,* 64 F.3d 833, 839 (3d Cir. 1995) ("[A] structured settlement effectively shelters from taxation the returns from the investment of the lump-sum payment."). Some injured workers may prefer periodic payments rather than a lump sum that could be squandered.

All parties, including insurers, are entitled to engage in settlement negotiations. Thornton testified he understood at the first settlement meeting in February 2012 that American Interstate's proposals were "just a first offer on the table" and that he was free to have his attorney review them. At mediation shortly thereafter, American Interstate restructured its proposals, increasing the amount of the annuity it offered.[6] American Interstate's bad faith was in contesting Thornton's PTD status, not in offering structured settlement proposals.

Next, we turn to whether there was a reasonable basis for American Interstate's resistance to Thornton's petition for commutation. Commutation of benefits is governed by Iowa Code section 85.45, which requires the *commissioner* (not the employer or insurer) to determine whether commutation is in the best interest of the worker:

---

WCMSA-Overview.html (last visited Apr. 19, 2017). It is recommended that the parties submit such proposals to the CMS for review. *Id.*

[6]The district court specifically noted Thornton was statutorily entitled to indemnity of $760,000 in present-day value, and American Interstate's initial offer only provided a payment of $600,000 on a lump-sum/annuity basis. However, American Interstate at the mediation in October 2012 increased its lump sum offer to $800,000, while Thornton's last demand as of the following February was for a lump sum of $1,160,000. The commissioner determined Thornton was PTD on May 23, 2013.

> 1. Future payments of compensation *may* be commuted to a present worth lump sum payment on the following conditions:
>
> *a.* When the period during which compensation is payable can be definitely determined.
>
> *b. When it shall be shown to the satisfaction of the workers' compensation commissioner that such commutation will be for the best interest of the person* or persons entitled to the compensation, or that periodical payments as compared with a lump sum payment will entail undue expense, hardship, or inconvenience upon the employer liable therefor.

Iowa Code § 85.45(1) (emphasis added).[7]  In short, Iowa law allows for commutation when it has been shown to the commissioner's satisfaction to be in the best interest of the worker.  This showing must be made whether the insurer stipulates to commutation or not.  *Reeves v. Nw. Mfg. Co.*, 202 Iowa 136, 141, 209 N.W. 289, 291 (1926) ("In the absence of the approval of the industrial commissioner, the terms of the stipulation could not be enforced as a commutation of the future payments of weekly compensation."); 15 James R. Lawyer, *Iowa Practice Series™: Workers' Compensation* § 27:1, at 339–40 (2016–2017 ed.).

> [T]he decision [of the commissioner] whether to allow commutation must turn on the statutory guideline, best interest of the claimant, and the focus should be on the worker's personal, family, and financial circumstances, and the reasonableness of the worker's plans for using the lump sum proceeds.

*Dameron v. Neumann Bros., Inc.*, 339 N.W.2d 160, 164 (Iowa 1983).

"While we encourage parties to negotiate fair settlements, we will not

---

[7]This Code section was amended this year.  H.F. 518, 87th G.A., 1st Sess. § 16 (Iowa 2017).  The new provision states,

> Future payments of compensation may be commuted to a present worth lump sum payment only upon application of a party to the commissioner and upon written consent of all parties to the proposed commutation or partial commutation, and on the following conditions . . . .

*Id.*  The amendment is inapplicable to the claims in this appeal.

penalize those who prefer a final judicial determination of their rights."
*Kendall v. Lowther*, 356 N.W.2d 181, 191 (Iowa 1984).

We have never decided whether a workers' compensation insurer can be sued in bad faith because it fails to smooth the employee's path to commutation by stipulating to it. American Interstate relies on an unpublished federal trial court decision, *Laughlin v. IBP*, the only case addressing whether an insurer can be sued for bad faith under Iowa law for resisting a petition for commutation. No. C99–2105, 2001 WL 34148156 (N.D. Iowa July 23, 2001). Robert Laughlin filed several applications for commutation that were resisted by his self-insured employer, IBP. *Id.* at *1. The commissioner denied each of Laughlin's applications for commutation. *Id.* Laughlin filed a bad-faith lawsuit against IBP based on its position resisting his applications.[8] *Id.* IBP moved for summary judgment. *Id.* The court granted IBP's motion dismissing the bad-faith claim, stating,

> Iowa Code § 85.45 clearly requires the industrial commissioner to make the determination of whether the commutation of benefits is appropriate. . . . Even if an insurer could be held liable for resisting the application for commutation under a bad faith standard, the statute's requirement that the industrial commissioner make the decision, and not the insurer, provides IBP with a "reasonable basis" for resisting the application.

*Id.* at *3. Thornton cites no contrary authority from any jurisdiction imposing bad-faith liability on a workers' compensation insurer or employer for resisting commutation. But unlike the *Laughlin* court, we elect to decide this case based on the factual record presented, without

---

[8]Self-insured employers are treated as insurers under the Iowa Workers' Compensation Act. *Laughlin*, 2001 WL 34148156, at *2.

foreclosing the possibility that a bad-faith claim may arise for resisting commutation under different facts.

In *Rodda*, we evaluated when a claim can be considered reasonably debatable on a point of law. 734 N.W.2d at 485. David Rodda, an injured employee, sued his employer for bad faith in denying him workers' compensation benefits. *Id.* at 482. The district court granted summary judgment dismissing the bad-faith claim. *Id.* at 483–84. We affirmed the summary judgment on grounds that it was "fairly debatable whether Rodda could simultaneously receive both workers' compensation benefits and unemployment benefits" under Iowa law. *Id.* at 484. We reasoned,

> Perhaps the most reliable method of establishing that the insurer's legal position is reasonable is to show that some judge in the relevant jurisdiction has accepted it as correct. The favorable decision need not have been available to the insurer at the time it acted on the claim. After all, if an impartial judicial officer informed by adversarial presentation has agreed with the insurer's position, it is hard to argue that the insurer could not have reasonably thought that position viable.

*Id.* at 485 (quoting William T. Barker & Paul E.B. Glad, *Use of Summary Judgment in Defense of Bad Faith Actions Involving First-Party Insurance*, 30 Tort & Ins. L.J. 49, 83 (1994)). We noted that several unpublished cases from the workers' compensation commissioner had reached the same conclusion as the position taken by the employer. *Id.* at 484–85. In addition, there were no Iowa court decisions on point, and the wording of the statute was unclear. *Id.* We held, "This, reinforced by the opinions by the workers' compensation commissioner's office, makes the question of whether a worker can receive both forms of benefits at least fairly debatable." *Id.* at 485; *see also Wilson v. Farm Bureau Mut. Ins.*, 714 N.W.2d 250, 263 (Iowa 2006) ("We agree with Farm Bureau that with

no Iowa law on the issue, its duty to consent to be bound by the amended judgment entry was fairly debatable.").[9]   Similarly, American Interstate argues the *Laughlin* decision alone provided a reasonable basis for American Interstate to oppose Thornton's commutation.

Commutation is unlike the payment of weekly benefits in which the statute *commands* the employer (or insurer) to take action and, thus, establishes the type of statutory duty for which a willful and deliberate breach can give rise to bad-faith liability in the workers' compensation

---

[9]American Interstate argues it would not have been on notice that its conduct resisting commutation could constitute bad faith and expose it to extra-contractual damage claims.  In wrongful-termination cases, we repeatedly have refused to allow punitive damages the *first* time we hold a particular statute or regulation codifies a public policy protecting against retaliatory discharge.  For example, in *Jasper v. H. Nizam, Inc.*, we held punitive damages were not recoverable when we had not previously held the requisite public policy could be based on an administrative regulation.  764 N.W.2d 751, 773–74 (Iowa 2009).  We explained,

> The rationale behind this rule is an employer cannot willfully and wantonly disregard rights of an employee derived from some specific public policy when the public policy has not first been declared by the legislature or our courts . . . .

*Id.* at 774.  We therefore concluded,

> Although the tort of wrongful discharge in violation of public policy has been recognized in Iowa for over twenty years, this case is the first time we have specifically recognized a cause of action for wrongful discharge arising from the refusal of the employee to violate administrative rules.  Additionally, there has otherwise been no declaration that the subject matter of the administrative rules in dispute in this case were of the type that would support a tort of wrongful discharge.  Consequently, we agree with the district court that punitive damages were not recoverable in this case.

*Id.*; *see also Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 308 (Iowa 2013) ("[A]n employer cannot willfully and wantonly disregard the rights of an employee based upon a violation of an administrative rule when at the time of discharge, we did not recognize administrative rules as a source of public policy."); *Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994) ("We agree that punitive damages should not be awarded when a new cause of action for retaliatory discharge is recognized."); *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 687 (Iowa 1990) ("[M]any of the courts confronted with the issue have held that punitive damages should not be awarded in the case that first recognizes the tort of retaliatory discharge due to a workers' compensation claim.").

field. *See, e.g.*, Iowa Code § 85.33(1) ("[T]he employer shall pay to an employee . . . ."); *id.* § 85.34 ("Compensation . . . shall be payable to an employee as provided in this section."). By contrast, future benefits "*may be commuted*" by the commissioner only if preconditions are met. *Id.* § 85.45(1). Section 85.45 imposes an affirmative burden on *the employee* to demonstrate commutation is in his or her best interest. *Id.* This determination involves a weighing by the commissioner of individual and personal considerations that may be clarified when the employee testifies at the commutation hearing. *See Dameron*, 339 N.W.2d at 163 ("[A]nalysis [of commutation] involves a benefit-detriment balancing of factors, with the worker's preference and the benefits to the worker of receiving a lump sum payment weighed against the potential detriments that would result if the worker invested unwisely, spent foolishly, or otherwise wasted the fund so it no longer provided the wage-substitute intended by our worker's compensation law.").

Against that legal backdrop, we conclude that American Interstate was not in bad faith for resisting commutation because Thornton's petition for commutation was fairly debatable *on its facts*. The reasonable basis element of a bad-faith claim "is an objective one." *Bellville*, 702 N.W.2d at 473. "A claim is 'fairly debatable' when it is open to dispute on any logical basis." *Id.* Thornton had never managed a large lump sum of money. Alexander testified commutation would be in Thornton's best interest only if Thornton could avoid invading the lump-sum principal. But that begs the question whether Thornton would invade the principal. Omissions in Thornton's proposed budget, his past spending habits, and his lack of experience with investments gave American Interstate a reasonable basis to question the commutation.

The commissioner's role in approving commutation is not a rubber stamp. Commutations have been denied based on concerns like those that American Interstate raised here. *See, e.g., Stoddard v. ADM/Growmark*, Iowa Workers' Comp. Comm'n No. 1140792, 2016 WL 845695, at *1 (Feb. 26, 2016) (denying a request for commutation in part because "neither the claimant nor his wife have even read the proposed financial plans for investing, combined with the claimant's poor financial choices"); *Deleon v. John Morrell & Co.*, Iowa Workers' Comp. Comm'n No. 5007832, 2013 WL 5508544, at *4 (Oct. 2, 2013) (finding that claimant's "lack of experience with any sophisticated financial dealings" was a "significant detriment[]" in denying a partial commutation); *Boner v. Bethany Lutheran Home*, Iowa Workers' Comp. Comm'n No. 5022480, 2012 WL 3158931, at *4 (Aug. 2, 2012) ("A commutation should not be granted if the evidence shows that claimant is a poor money manager or is incapable of making wise investments.").

We hold the district court erred by denying American Interstate's motion for directed verdict on the commutation claim and erred by instructing the jury that American Interstate acted in bad faith opposing Thornton's commutation. That error requires a new trial on liability and damages. Much of Thornton's $284,000 compensatory damage award was directly attributable to the delay in the commutation award, including $14,000 in loss-of-use of money damages, $27,000 in loss of home equity, and part of the $118,000 in consequential damages for attorney fees incurred in the commutation proceedings.

In *Bryant v. Parr*, we held that an inconsistent verdict on two damage claims—awarding $16,937 for past medical specials but only one dollar for past pain and suffering—required a new trial on "all elements of damage." 872 N.W.2d 366, 376–78, 381–82 (Iowa 2015). Neither

party sought a new trial on liability. *Id.* at 380. We rejected the defendant's argument that the verdict awarding no future damages should stand. *Id.* at 382. We noted the "general rule is that when a new trial is granted, all issues must be retried." *Id.* at 380 (quoting *McElroy v. State,* 703 N.W.2d 385, 389 (Iowa 2005)). We also noted "the award for one element of damages may affect another," and "our general reluctance to engage in speculation to uphold findings in an inconsistent verdict." *Id.* at 382.

We cannot let the jury verdict stand on liability for the surviving bad-faith claims. In *Central Life Insurance,* we held a jury verdict on first-party bad faith could not stand because the court erroneously instructed the jury the insurer acted in bad faith by challenging an appraisal award. 466 N.W.2d at 263. We concluded "the court's instructions tainted any consideration of [the insurer's] claim that it may have acted in good faith." *Id.* Here, the trial was fatally tainted by the erroneous instruction that "there has been a previous determination by the Court that the defendant did not have a reasonable basis for [contesting] a partial commutation." The other bad-faith claims do not cure the taint from the bad instruction.

We reverse the judgment on the jury verdict and remand the case for an order dismissing the claim American Interstate acted in bad faith by opposing commutation and for a new trial on the remaining bad-faith claims.

**B. Allowable Damages.** "Because this case must be retried, we will consider [American Interstate's] other challenges to the jury instructions." *State v. Hoyman,* 863 N.W.2d 1, 16 (Iowa 2015). American Interstate argues the court lacked subject matter jurisdiction to award damages for delaying the purchase of Thornton's new

wheelchair because the commissioner has exclusive jurisdiction for a claim alleging the failure to provide satisfactory care. It separately argues there was insufficient evidence to support instructing the jury on damages for physical and emotional pain and suffering.[10] Both American Interstate and Thornton have fully briefed these issues, and they are likely to arise on remand. *See State v. Dudley*, 766 N.W.2d 606,

---

[10]Thornton contests error preservation on these arguments. American Interstate objected to instruction No. 29, outlining damages, during the jury instruction conference. Thornton contends this objection was insufficient to preserve error because an instruction was later eliminated at the conference, resulting in renumbering that instruction to No. 28. Thornton argues a bill of exceptions was necessary to clarify to which instruction American Interstate referred. We disagree.

Under Iowa Rule of Civil Procedure 1.924, "all objections to giving or failing to give any instruction must be made in writing or dictated into the record, . . . specifying the matter objected to and on what grounds." If the district court revises instructions after objections are made, "similar specific objection to the revision or addition may be made in the motion for new trial, and if not so made shall be deemed waived." *Id.* Objections must be "sufficiently specific to alert the trial court to the basis of the complaint." *Olson v. Sumpter*, 728 N.W.2d 844, 849 (Iowa 2007) (quoting *Boham v. City of Sioux City*, 567 N.W.2d 431, 438 (Iowa 1997)).

A bill of exceptions is necessary "only to show material portions of the record of the cause not shown by the court files, entries, or legally certified shorthand notes of the trial, if any." Iowa R. Civ. P. 1.1001(1). Its purpose is to "provide a factual record of the proceedings in the event this cannot be shown in the court file or reporters' notes." 8 Tom Riley & Peter C. Riley, *Iowa Practice Series™, Civil Litigation Handbook* § 76:30, at 866 (2016 ed.); *see also* Thomas A. Mayes & Anuradha Vaitheswaran, *Error Preservation in Civil Appeals in Iowa: Perspectives on Present Practice*, 55 Drake L. Rev. 39, 48–49 (2006) (stating counsel may submit a bill of exceptions to preserve the record when "the grounds for appeal concern matters presented in the unreported hearing"). When the record before the district court is sufficient to alert the appellate court of the grounds for appeal, no bill of exceptions is necessary to preserve error.

The jury instruction conference was reported. American Interstate objected to instruction No. 29, the damages instruction. Specifically, American Interstate objected as to part A of the instruction, mental pain and suffering, stating, "There's no evidence of past mental pain and suffering, nor is there any medical record or testimony to establish that." American Interstate echoed these objections as to parts B and H, physical pain and suffering and home equity damages, respectively. Although the number on the instruction later changed from 29 to 28, no other instruction spoke to the types of damages recoverable. These objections were renewed in American Interstate's posttrial motion. We conclude American Interstate preserved error. No bill of exceptions was required. It is patently obvious that the trial lawyers and court all knew which instruction was at issue.

615 (Iowa 2009) (remanding case for new trial but addressing issues likely to arise on remand). If we determine there was insufficient evidence as a matter of law to instruct on certain damages, the district court must decline to give such instructions on remand. *See Coker v. Abell-Howe Co.,* 491 N.W.2d 143, 150 (Iowa 1992) (reversing on other grounds but addressing whether there was sufficient evidence to submit jury instruction "on remand").

1. *Subject matter jurisdiction.* American Interstate argues the district court lacked subject matter jurisdiction to award damages arising out of the delay in ordering the new wheelchair.[11] We have previously dismissed claims by employees alleging deficient care on the ground that the workers' compensation commissioner has exclusive jurisdiction over challenges to the reasonableness of medical care provided by the employer. *See Kloster,* 612 N.W.2d at 775 (holding employee dissatisfied with chiropractic care provided by employer was required to exhaust administrative remedies with commissioner); *Harned v. Farmland Foods, Inc.,* 331 N.W.2d 98, 101 (Iowa 1983) (affirming dismissal of tort action arising from employer's failure to provide chiropractic care to employee based on exclusive jurisdiction of commissioner). However, these cases did not involve first-party bad-faith claims against the workers' compensation insurer.

In *Kiner v. Reliance Insurance,* we expressly held the district court had subject matter jurisdiction over a claimant's bad-faith claim against a workers' compensation insurer arising from an unreasonable denial of

---

[11]Although American Interstate failed to argue lack of subject matter jurisdiction at the district court, a challenge to subject matter jurisdiction "may be made at any time." *See Kloster,* 612 N.W.2d at 773–74; *Bailey v. Batchelder,* 576 N.W.2d 334, 337–38 (Iowa 1998) (holding the exclusivity of the Workers' Compensation Act goes to the court's subject matter jurisdiction and can be raised at any time).

medical benefits. 463 N.W.2d 9, 11–12 (Iowa 1990). Ronald Kiner fell while on the job and obtained a prescription for pain medications. *Id.* at 11. When his workers' compensation insurer refused to pay for the medications, he filed a bad-faith claim. *Id.* Rejecting the insurer's argument that Iowa Code chapter 85 provided the exclusive remedy, we stated,

> It is axiomatic that an employee's rights and remedies arising from an injury suffered in the course of employment are exclusively provided under Iowa Code chapter 85. A district court would ordinarily have no subject matter jurisdiction over a claim that an employee is entitled to workers' compensation benefits. But this exclusivity principle is limited to matters surrounding a job-related injury and does not extend to subsequent dealings during which a tort may arise by reason of bad faith on the part of an employer's insurer.

*Id.* (citation omitted) (quoting *Tallman v. Hanssen,* 427 N.W.2d 868, 870 (Iowa 1988)).

In *Boylan,* we again clarified that bad-faith claims *supplement* the workers' compensation statute. 489 N.W.2d at 744. We noted,

> [I]t is unlikely that the legislature intended the penalty provision in section 86.13 to be the sole remedy for all types of wrongful conduct by carriers with respect to administration of workers' compensation benefits. By its terms, it applies only to delay in commencement or termination of benefits. It contemplates negligent conduct rather than the willful or reckless acts that are required to establish a cause of action under *Dolan.* In addition, no remedy is provided under section 86.13 for delay or failure to pay medical benefits.

*Id.* We specifically held that the workers' compensation statute did not preclude a common law bad-faith action. *Id.*; *see also Southerland v. Argonaut Ins.,* 794 P.2d 1102, 1106 (Colo. App. 1990) (stating "ongoing difficulties in securing rehabilitation were merely a continuation of the same difficulties that preceded the filing of the complaint and were

relevant as evidence of defendant's habitual pattern in dealing with plaintiff"). Accordingly, common law bad-faith tort claims do not fall within the commissioner's exclusive jurisdiction. We hold the district court has subject matter jurisdiction over Thornton's bad-faith claim alleging American Interstate unreasonably delayed the delivery of his new wheelchair.

We now turn to whether there was insufficient evidence to submit certain elements of damages resulting from American Interstate's bad-faith conduct.

2. *Sufficiency of the evidence.* "Proposed instructions must enjoy support in the pleadings and substantial evidence in the record." *Vasconez v. Mills*, 651 N.W.2d 48, 52 (Iowa 2002). "Evidence is substantial if a reasonable person would accept it as adequate to reach a conclusion." *Id.* If at the close of the evidence "the record is insufficient to support a party's theory of recovery or defense, the court need not submit the theory to the jury and may direct a verdict on the issue as a matter of law." *Id.*

We conclude there was sufficient evidence to submit the claims for physical and emotional pain and suffering. We view the evidence in the light most favorable to Thornton. A reasonable jury could find American Interstate's delay in ordering a replacement wheelchair was a cause of Thornton's pain. Rodgers knew Thornton needed a wheelchair replacement every five years. Rodgers received Dr. Rogge's notes stating he wrote a prescription for a new wheelchair, yet she failed to order one or inquire about the status of the order. Medical records from Thornton's hospitalization for bursitis indicate he felt like his "arm was on fire." Dr. Rogge testified he "suspect[ed]" the bursitis was "most likely due to chronic irritation." He further explained,

> The arms of his old chair are very firm and hard. We've even talked about the other day when he was in, I told him he needs to get some type of towel or extra padding on it because it's just—it's in such grave condition that it probably did not do him any favors with this infection, and he was hospitalized because of it.

Dr. Rogge noted he "hope[d]" a new chair would alleviate the problem because the new chair was "going to be padded better." This evidence was minimally sufficient for a jury to find Thornton suffered painful injuries attributable to American Interstate's delay in ordering his new wheelchair.

We decline to address the sufficiency of the evidence to support instructions on the loss of use of money and home equity. American Interstate's bad faith in contesting Thornton's PTD status delayed his application for commutation and ultimate lump-sum award he needed to purchase a home, but the insurer was not in bad faith for opposing commutation. The district court will have to determine on a new trial record whether the evidence is sufficient to submit those elements of damage.

**C. Attorney Fees.** Finally, we address Thornton's cross-appeal requesting attorney fees incurred litigating the bad-faith action. The district court denied Thornton's request to submit the issue of attorney fees incurred in the bad-faith litigation to the jury as damages. The court also denied Thornton's posttrial motion for attorney fees.

Thornton cites no cases allowing recovery of the attorney fees incurred prosecuting the bad-faith action against a first-party insurer, and we found none. Iowa follows the American rule: "the losing litigant does not normally pay the victor's attorney's fees." *Rowedder v. Anderson*, 814 N.W.2d 585, 589 (Iowa 2012)). "Generally, attorney fees are recoverable only by statute or under a contract." *Miller v. Rohling,*

720 N.W.2d 562, 573 (Iowa 2006). There is a "rare" common law exception to this rule, permitting recovery of attorney fees when the defendant "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (quoting *Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co. of Des Moines*, 510 N.W.2d 153, 158 (Iowa 1993)).

Thornton does not assert any statute or contract allows attorney fees in this matter. Rather, Thornton relies on *New Hampshire Insurance Co. v. Christy*, 200 N.W.2d 834, 845 (Iowa 1972). In *Christy*, we recognized

> an insurer who refuses, contrary to its contractual obligation, to defend a third-party action against its insured on the ground the policy involved affords no coverage is liable for reasonable attorney fees incurred by the insured in defense of the action brought against him.

*Id.* In such circumstances, insureds are "thrust into litigation" by reason of the insurance company's refusal, in breach of contract, to defend the suit. *Id.* at 841. Additionally, we noted the insured may recover "an award for expenses incurred in an action to establish insurance coverage" when the insurance company acted in bad faith denying a claim. *Id.* at 845.

*Christy* allows Thornton to recover his attorneys fees incurred *in the workers compensation proceedings* as consequential damages caused by American Interstate's bad faith. These fees are akin to attorney fees incurred to "establish insurance coverage." *Id.*; *see also Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. ___, ___, 137 S. Ct. 1178, 1184 (2017) (allowing recovery of the "fees the innocent party incurred solely because of the misconduct—. . . [that is], the fees that party would not have

incurred but for the bad faith").[12]  But *Christy* does not support awarding additional fees incurred in prosecuting the bad-faith action.  The American rule controls.  Indeed, after *Christy,* we made clear in *Brown Township Mutual Insurance Association v. Kress* that "under the American rule which is followed in this jurisdiction attorney fees are ordinarily not recoverable by the prevailing party in absence of statute." 330 N.W.2d 291, 300 (Iowa 1983).[13]  As the Colorado Supreme Court held,

> Unless we are prepared to abandon the American rule for the English rule of automatically awarding attorney fees to the prevailing party, it would be difficult to carve out an exception that allows an award of attorney fees that are incidental to the bringing of a bad faith breach of contract action.  Attorney fees are incurred by most parties to most lawsuits.  If the goal were always to make the prevailing party genuinely whole, these fees would be an element of damage.  But such is not the law.

*Bernhard v. Farmers Ins. Exch.*, 915 P.2d 1285, 1291 (Colo. 1996) (en banc) ("[W]e hold that Bernhard's claim for attorney fees incurred in bringing a bad faith breach of insurance contract action does not fit into any exception to the American rule recognized in Colorado.").  We reach the same conclusion.

Thornton argues this case falls into the rare common law exception.  We disagree.

---

[12]Thornton can submit the fees he incurred to establish his PTD status but not the additional fees he incurred to obtain the commutation award.  If the jury finds American Interstate acted in bad faith in delaying the new wheelchair, Thornton may also submit his fees incurred filing his petition for alternate medical care through the hearing on November 4, 2014, when the wheelchair was ordered.

[13]The *Kress* court gave an additional reason for denying attorney fees: we had not yet recognized the tort of first-party insurance bad faith.  330 N.W.2d at 300.  We recognized that cause of action five years later.  *See Dolan,* 431 N.W.2d at 794.  But the *Kress* court's alternative holding on the American rule remains good law.  330 N.W.2d at 300.

> [A] plaintiff seeking common law attorney fees must prove that the culpability of the defendant's conduct exceeds the "willful and wanton disregard for the right of another"; such conduct must rise to the level of oppression or connivance to harass or injure another.

*Hockenberg Equip. Co.*, 510 N.W.2d at 159–60. We have defined oppressive conduct as conduct that is "difficult to bear, harsh, tyrannical, or cruel." *Id.* at 159. Likewise, connivance requires "voluntary blindness [or] an intentional failure to discover or prevent the wrong." *Id.* (quoting *Connivance, Black's Law Dictionary* (6th ed. 1990)). "These terms envision conduct that is intentional and likely to be aggravated by cruel and tyrannical motives. Such conduct lies far beyond a showing of mere 'lack of care' or 'disregard for the rights of another.'" *Id.* This threshold is difficult to meet. *See Williams v. Van Sickel*, 659 N.W.2d 572, 581 (Iowa 2003) (awarding common law attorney fees when public official fabricated documents to benefit herself to the detriment of others, but limiting recovery to fees incurred after the forgery); *Wolf v. Wolf*, 690 N.W.2d 887, 896 (Iowa 2005) ("Although the defendant's conduct in this case was clearly willful and demonstrated a wanton disregard for [plaintiff's] rights, we do not believe the evidence meets the heightened standard of oppression or connivance under the *Hockenberg* test.").

On our de novo review, we find American Interstate's conduct does not satisfy the *Hockenberg* test. American Interstate continually paid the stipulated weekly benefits for PTD. Thornton points to American Interstate's failure to provide certain documents and delays during the agency proceedings, but we find none that rose to the level of oppression or connivance required to award common law attorney fees. More than mere bad faith is required for this common law exception to the

American rule. *Wolf*, 690 N.W.2d at 896. We affirm the district court's rulings denying Thornton fees incurred prosecuting his bad-faith action.

### IV. Disposition.

For those reasons, we affirm the partial summary judgment that American Interstate contested Thornton's PTD status in bad faith. We reverse the district court's partial summary judgment that the insurer acted in bad faith for disputing Thornton's petition for commutation. We reverse the judgments for actual and punitive damages and remand the case for a new trial on the remaining claims for bad faith. We affirm on cross-appeal the ruling denying an award of attorney fees incurred prosecuting this bad-faith action. Costs of this appeal shall be assessed equally to each party.

**DISTRICT COURT JUDGMENTS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED FOR NEW TRIAL.**